Robert V. Prongay (SBN 270796)
 rprongay@glancylaw.com
Charles H. Linehan (SBN 307439)
 clinehan@glancylaw.com
Pavithra Rajesh (SBN 323055)
 prajesh@glancylaw.com
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Plaintiff Jeffrey Hindlemann*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY HINDLEMANN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MOLINA HEALTHCARE, INC., JOSEPH M. ZUBRETSKY, and MARK L. KEIM,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jeffrey Hindlemann ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Molina Healthcare, Inc. ("Molina" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Molina; and (c) review of other publicly available information concerning Molina.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Molina securities between February 5, 2025 and July 23, 2025, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Molina provides healthcare services to low-income individuals under the Medicaid and Medicare programs and through the state insurance marketplaces.

3. On July 7, 2025, before the market opened, Molina issued a press release announcing financial results for the second quarter of 2025 and slashing full year 2025 adjusted earnings per share guidance. The press release revealed the Company's second quarter 2025 adjusted earnings of approximately $5.50 per share, which was "***below its prior expectations***"[1] due to "***medical cost pressures in all three lines of business***." The Company announced it "expects these medical cost pressures to continue into the second half of the year" and cut guidance for expected adjusted earnings per share 10.2% at the midpoint, from "at least $24.50 per share" to a "range of $21.50 to $22.50 per share." The press release revealed Molina was experiencing

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

a "short-term earnings pressure" from a "***dislocation between premium rates and medical cost trend which has recently accelerated.***"

4.    On this news, Molina's stock price fell $6.97, or 2.9%, to close at $232.61 per share on July 7, 2025, on unusually heavy trading volume.

5.    Then, on July 23, 2025, after the market closed, Molina issued a press release reporting its financial results for the second quarter ended June 30, 2025 and further slashing the Company's full-year 2025 earnings guidance. The press release revealed, in part, that the Company's "GAAP net income was $4.75 per diluted share for the second quarter of 2025, a decrease of 8% year over year;" and it "***now expects its full year 2025 adjusted earnings to be no less than $19.00 per diluted share.***" This represented another 13.6% cut to guidance of earnings per share at the midpoint, from the cut to guidance announced less than two weeks earlier. The Company also cut its guidance for its full year 2025 GAAP net income 27% to $912 million. The Company attributed its results a full year outlook to a "challenging medical cost trend environment," including mere "***utilization of behavioral health, pharmacy, and inpatient and outpatient services.***" The Company alleged its guidance cut also reflected "new information gained in the quarterly closing process."

6.    On this news, Molina's stock price fell $32.03, or 16.84%, to close at $158.22 per share on July 24, 2025, on unusually heavy trading volume.

7.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) material, adverse facts concerning the Company's "medical cost trend assumptions;" (2) that Molina was experiencing a "dislocation between premium rates and medical cost trend;" (3) that Molina's near term growth was dependent on a lack of "utilization of behavioral health, pharmacy, and inpatient and outpatient services;" (4) as a result of the foregoing, Molina's financial guidance for fiscal year 2025 was substantially likely to be cut; and (5) that, as a result of the

foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

8.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are in this District.

12.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13.    Plaintiff Jeffrey Hindlemann, as set forth in the accompanying certification, incorporated by reference herein, purchased Molina securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.     Defendant Molina is incorporated under the laws of Delaware with its principal executive offices located in Long Beach, California. Molina's common stock trades on the New York Stock Exchange ("NYSE") exchange under the symbol "MOH."

15.     Defendant Joseph M. Zubretsky ("Zubretsky") was the Company's Chief Executive Officer ("CEO") at all relevant times.

16.     Defendant Mark L. Keim ("Keim") was the Company's Chief Financial Officer ("CFO") at all relevant times.

17.     Defendants Zubretsky and Keim (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     Molina is a health insurance company which provides managed healthcare services under the Medicaid and Medicare programs, and through the state insurance marketplaces. As of June 30, 2025, it serves approximately 5.7 million members eligible for government-sponsored healthcare programs, located across 22 states. It operates in four segments: Medicaid, Medicare, Marketplace, and Other.

**Materially False and Misleading**

**Statements Issued During the Class Period**

19. The Class Period begins on February 5, 2025. On that day, the Company issued a press release reporting its financial results for the fourth quarter and year ended December 31, 2024 and the Company's full-year 2025 revenue and earnings guidance. The press release touted the Company's financial results and purported full year revenue guidance as follows in relevant part:

**Molina Healthcare Reports Fourth Quarter and Year-End 2024 Financial Results**

*Introduces Full Year 2025 Revenue and Earnings Guidance*

**Long Beach, Calif, February 5, 2025** – Molina Healthcare, Inc. (NYSE: MOH) (the "Company") today reported fourth quarter 2024 GAAP earnings per diluted share of $4.44 and adjusted earnings per diluted share of $5.05. The Company also reported full year 2024 GAAP earnings per diluted share of $20.42 and adjusted earnings per diluted share of $22.65. Financial results are summarized below:

| | Three months ended December 31, | | Year ended December 31, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| *(In millions, except per-share results)* | | | | |
| Premium Revenue | $9,983 | $8,362 | $38,627 | $32,529 |
| Total Revenue | $10,499 | $9,048 | $40,650 | $34,072 |
| | | | | |
| **GAAP:** | | | | |
| Net Income | $251 | $216 | $1,179 | $1,091 |
| EPS – Diluted | $4.44 | $3.70 | $20.42 | $18.77 |
| Medical Care Ratio (MCR) | 90.2 % | 89.1 % | 89.1 % | 88.1 % |
| G&A Ratio | 6.3 % | 7.1 % | 6.7 % | 7.2 % |
| After-tax Margin | 2.4 % | 2.4 % | 2.9 % | 3.2 % |
| | | | | |
| **Adjusted:** | | | | |
| Net Income | $286 | $255 | $1,308 | $1,213 |
| EPS – Diluted | $5.05 | $4.38 | $22.65 | $20.88 |
| G&A Ratio | 6.3 % | 7.0 % | 6.7 % | 7.2 % |
| After-tax Margin | 2.7 % | 2.8 % | 3.2 % | 3.6 % |

*See the Reconciliation of Unaudited Non-GAAP Financial Measures at the end of this release.*

**Full Year Highlights**

• As of December 31, 2024, the Company served approximately 5.5 million members.

• Premium revenue was approximately $38.6 billion for the full year 2024, an increase of 19% year over year.

• GAAP net income was $20.42 per diluted share for the full year 2024, an increase of 9% year over year.

•Adjusted net income was $22.65 per diluted share for the full year 2024, an increase of 8% year over year.

•***The Company issued its full year 2025 earnings guidance with expected premium revenue of approximately $42 billion and adjusted earnings of at least $24.50 per diluted share, which includes approximately $1.00 per diluted share of implementation costs for recent***

Medicaid and Medicare Duals contract wins scheduled to commence in 2026 and yields approximately 13% growth over 2024.

•New store embedded earnings is now at $7.75 per diluted share and reflects recent Medicaid and Medicare Duals contract wins.

"I am very pleased our 2024 revenue growth exceeded our long-term targets and we produced consolidated pre-tax margins within our long-term target range," said Joseph Zubretsky, President and Chief Executive Officer. "Our earnings growth profile is solid heading into 2025, and we continue to execute on the long-term growth opportunities within all of our businesses. We remain confident in our ability to achieve our long-term financial targets."

*       *       *

**Medical Care Ratio (MCR)**

•The consolidated MCR for the full year 2024 was 89.1% and reflects continued focus on managing medical costs and a well-balanced portfolio of businesses.

•The Medicaid MCR for the full year 2024 was 90.3%. Within that result, approximately 30 basis points were due to Medicaid "new store" plans, which have continued to improve in line with the Company's expectations, and approximately 20 basis points were due to a premium rate reduction retroactive to 2023. Excluding the new stores and retroactive premium adjustment, the Medicaid MCR was approximately 89.8%, which is higher than the Company's long-term expectations and primarily due to the impact of redetermination-related acuity shifts and higher utilization that occurred during the second half of 2024.

•The Medicare MCR for the full year 2024 was 89.1%, which primarily reflects higher-than-expected utilization, partially offset by benefit adjustments implemented for 2024.

•The Marketplace MCR for the full year 2024 was 75.4%, better than the Company's expectations, reflecting strong operating performance

*       *       *

**2025 Guidance**

Premium revenue for the full year is expected to be approximately $42 billion, an increase of approximately 9% from the full year 2024.

***The Company expects its full year GAAP earnings per share in 2025 to be at least $22.50 per share and its full year adjusted earnings per share in 2025 to be at least $24.50 per share, representing 8% growth over the full year 2024.*** This increase primarily reflects growth in the Company's legacy footprint and continued realization of new store embedded earnings, partially offset by approximately $1.00 per diluted share of expected implementation costs in 2025 for recent Medicaid and Medicare Duals contract wins, and yields approximately 13% growth over 2024.

Guidance metrics are summarized below:

| Full Year 2025 Guidance | |
|---|---|
| Premium Revenue | $42.0B |
| Total Revenue | $44.0B |
| GAAP Net Income | $1,251M |
| Adjusted Net Income | $1,362M |
| GAAP EPS – Diluted | >$22.50 |
| Adjusted EPS – Diluted | >$24.50 |
| Diluted weighted average shares | 55.6M |
| Year End Total Membership | 5.9M |
| Medicaid | 5.0M |
| Medicare | 250K |
| Marketplace | 580K |
| MCR | 88.7% |
| GAAP G&A Ratio | 7.2% |
| Adjusted G&A Ratio | 7.0% |
| Effective Tax Rate | 25.3% |
| GAAP After-tax Margin | 2.8% |
| Adjusted After-tax Margin | 3.1% |

20.    On February 11, 2025, the Company submitted its annual report for the fiscal year ended December 31, 2024 on a Form 10-K filed with the SEC (the "FY24 10-K"). The FY24 10-K affirmed the previously reported financial results, and further reported the alleged results of the Company's change in medical claims and benefits payable for the fiscal year, as follows, in relevant part:

| | Year Ended December 31, 2024 | | | |
|---|---|---|---|---|
| | Medicaid | Medicare | Marketplace | Consolidated |
| | (In millions) | | | |
| Medical claims and benefits payable, beginning balance | $ 3,444 | $ 532 | $ 228 | $ 4,204 |
| Components of medical care costs related to: | | | | |
| Current year | 28,211 | 5,000 | 1,892 | 35,103 |
| Prior years | (611) | (61) | (3) | (675) |
| Total medical care costs | 27,600 | 4,939 | 1,889 | 34,428 |
| Payments for medical care costs related to: | | | | |
| Current year | 24,950 | 4,464 | 1,646 | 31,060 |
| Prior years | 2,258 | 761 | 220 | 3,239 |
| Total paid | 27,208 | 5,225 | 1,866 | 34,299 |
| Acquired balances, net of post-acquisition adjustments | — | 476 | — | 476 |
| Change in non-risk and other provider payables | (169) | — | — | (169) |
| Medical claims and benefits payable, ending balance | $ 3,667 | $ 722 | $ 251 | $ 4,640 |

21.    The FY24 10-K reported the Company's key business metrics including the "Basis for Premium Rates" which purportedly "***considers inflation, non-benefit expense requirements, other Medicare Advantage bids submitted to CMS, changes in utilization patterns.***" The FY24 10-K further described the Company's purported "***utilization management***" strategies, which purported to assure investors the Company could provide utilization as well as "***high-quality, affordable care***" and "***mitigate the negative effects of healthcare cost inflation.***" Specifically, the FY24 10-K stated as follows, in relevant part:

**Basis for Premium Rates**

Under Medicare Advantage, managed care plans contract with CMS, and for the dual-eligible programs with CMS and state governments, to provide benefits in exchange for a PMPM premium payment that varies based on health plan Star rating and member demographics, including county of residence and health risk factors. ***The premium payment considers inflation, non-benefit expense requirements, other Medicare Advantage bids submitted to CMS, changes in utilization patterns and average per capita fee-for-service Medicare costs in the calculation of the PMPM premium payment.*** Amounts payable to us under the dual-eligible programs and Medicare Advantage contracts are subject to annual revision by CMS, including any federal budget cuts or tax changes applicable to Medicare. We elect to participate in each Medicare service area or region on an annual basis.

*                    *                    *

**Basis for Premium Rates**

For Marketplace, we develop each state's premium rates during the spring of each year for policies effective in the following calendar year. ***Premium rates are based on our estimates of utilization of services and unit costs, anticipated member risk acuity and related federal risk adjustment transfer amounts, and non-benefit expenses such as administrative costs, taxes, and fees.*** The premium rates are filed for approval with the various state and federal authorities in accordance with the rules and regulations applicable to the ACA individual market, including, but not limited to, minimum loss ratio thresholds and adjustments for permissible rate variations by age, geographic area, and variations in plan design. In the year ended December 31, 2024, Marketplace program PMPM premium rates ranged from $400 to $1,980.

*                    *                    *

**Utilization Management**

Our goal is to optimize access to low-cost, high-quality care. This is achieved by sound clinical policy based on current evidence-based practices. Additionally, we continuously monitor utilization patterns and strive to identify new opportunities to reduce costs and improve quality of care. Our utilization management process serves as a bridge to identify at-risk members for referral into internally developed case management programs such as "Transitions of Care," which facilitates post-discharge safety and appropriate outcomes.

**Population Management**

We believe high-quality, affordable care is achieved through a variety of programs tailored to our members' emerging needs. Individuals are identified for interventions, and programs are customized, based on predictive analytics and our member assessment process. These tools ensure that the appropriate level of services and support are provided to address physical health, behavioral health, and social determinants of health. This comprehensive and customized approach is designed to help members achieve their goals and improve their overall quality of life.

**Pharmacy Management**

Our pharmacy programs are designed to make us a trusted partner in improving member health and healthcare affordability. We strategically partner with physicians and other healthcare providers who treat our members. This collaboration results in drug formularies and clinical initiatives that promote improved patient care. We employ full-time pharmacists and pharmacy technicians who work closely with providers to educate them about our formulary products, clinical programs, and the importance of cost-effective care.

**Medical Cost Management**

We use various strategies to mitigate the negative effects of healthcare cost inflation. Specifically, our health plans use coordination of care programs for our members, product and benefit designs, hospital inpatient management systems, sophisticated analytics, and care management programs related to complex chronic conditions, prenatal and premature infant care and certain other conditions. Our health plans emphasize preventive healthcare and appropriate use of specialty and hospital services with their contracted independent providers. There can be no assurance, however, that our strategies to mitigate medical care cost inflation will be successful. Competitive pressures, new healthcare and pharmaceutical product introductions, demands from healthcare providers and customers, applicable regulations, or other factors may affect our ability to control medical care costs.

22.    The FY24 10-K further purported to warn of risks which "***may***" or "***could***" negatively impact the Company, including those related to demand, as follows in relevant part:

> ***A failure to accurately estimate incurred but not paid medical care costs may negatively impact our results of operations.***

Because of the lag in time between when medical services are actually rendered by our providers and when we receive, process, and pay a claim for those medical services, we must continually estimate our medical claims liability at particular points in time and establish claims reserves related to such estimates. Our estimated reserves for such incurred but not paid, or IBNP, medical care costs are based on numerous assumptions and inputs. We estimate our medical claims liabilities using actuarial methods based on historical data adjusted for claims receipt and payment experience (and variations in that experience), changes in membership, provider billing practices, healthcare service utilization trends, cost trends, product mix, seasonality, prior authorization of medical services, benefit changes, known incidence of disease, or increased incidence of illness such as the flu or COVID, provider contract changes, changes to Medicaid fee schedules, and the incidence of high dollar or catastrophic claims. Our ability to accurately estimate claims for our newer lines of business or populations is negatively impacted by the more limited experience we have had with those newer lines of business or populations.

*          *          *

**_If we fail to accurately predict and effectively manage our medical care costs, our operating results could be materially and adversely affected._**

Our profitability depends to a significant degree on our ability to accurately predict and effectively manage our medical care costs. Historically, our medical care ratio, meaning our medical care costs as a percentage of our premium revenue, has fluctuated substantially, and has varied across our health plans. Because the premium payments we receive are generally fixed in advance and we operate with a narrow profit margin, relatively small changes in our medical care ratio can create significant changes in our overall financial results. For example, if our overall medical care ratio of 89.1% for the year ended December 31, 2024, had been one percentage point higher, or 90.1%, our net income per diluted share for the year ended December 31, 2024 would have been approximately $15.18 rather than our actual net income per diluted share of $20.42, a difference of $5.24.

23.    On April 23, 2025, Molina issued a press release reporting its financial results for the first quarter ended March 31, 2025 and reaffirming the Company's full-year 2025 revenue and earnings guidance. The press release touted the Company's financial results and purported full year revenue guidance as follows in relevant part:

**Molina Healthcare Reports First Quarter 2025 Financial Results**

_Reaffirms Full Year 2025 Guidance_

Long Beach, Calif, April 23, 2025 – Molina Healthcare, Inc. (NYSE: MOH) (the "Company") today reported first quarter 2025 GAAP earnings per diluted share of $5.45 and adjusted earnings per diluted share of $6.08. Financial results are summarized below:

|  | Three months ended March 31, | |
|---|---|---|
|  | 2025 | 2024 |
| *(In millions, except per-share results)* | | |
| Premium Revenue | $10,628 | $9,504 |
| Total Revenue | $11,147 | $9,931 |
| **GAAP:** | | |
| Net Income | $298 | $301 |
| EPS – Diluted | $5.45 | $5.17 |
| Medical Care Ratio (MCR) | 89.2 % | 88.5 % |
| G&A Ratio | 6.9 % | 7.2 % |
| After-tax Margin | 2.7 % | 3.0 % |
| **Adjusted:** | | |
| Net Income | $333 | $334 |
| EPS – Diluted | $6.08 | $5.73 |
| G&A Ratio | 6.8 % | 7.1 % |
| After-tax Margin | 3.0 % | 3.4 % |

## Quarter Highlights

•As of March 31, 2025, the Company served approximately 5.8 million members, an increase of 25,000 members compared to March 31, 2024.

•Premium revenue was approximately $10.6 billion for the first quarter of 2025, an increase of 12% year over year.

•GAAP net income was $5.45 per diluted share for the first quarter of 2025, an increase of 5% year over year.

•Adjusted net income was $6.08 per diluted share for the first quarter of 2025, an increase of 6% year over year.

•***The Company reaffirmed its full year 2025 earnings guidance with expected premium revenue of approximately $42 billion and adjusted earnings of at least $24.50 per diluted share.***

•New store embedded earnings are now at $8.65 per diluted share.

 "Our first quarter results reflect our team's disciplined approach to medical cost management in an improving rate environment," said Joseph Zubretsky, President and Chief Executive Officer. "Our 2025 earnings and growth profiles are solid, and we remain confident in our ability to achieve our 13% to 15% long-term adjusted EPS growth target."

*                    *                    *

**Medical Care Ratio (MCR)**

•The consolidated MCR for the first quarter of 2025 was 89.2% and reflects strong medical cost management.

•The Medicaid MCR for the first quarter of 2025 was 90.3% and in line with the Company's expectations. Medical costs increased moderately as expected due to utilization of long-term services and supports, pharmacy, and behavioral health services, as well as seasonal illnesses. These higher medical costs were offset by the new rate cycle.

•The Medicare MCR for the first quarter of 2025 was 88.3%, and in line with the Company's expectations, reflecting pricing and benefit adjustments implemented for 2025 and the exit from MAPD in thirteen states.

•The Marketplace MCR for the first quarter of 2025 was 81.7%. Within that result, approximately 400 basis points was due to prior year final risk adjustment and member reconciliations and a higher "new store" MCR related to the ConnectiCare acquisition. Excluding these items, the Marketplace MCR was approximately 77.7% and in line with the Company's expectations.

*          *          *

**2025 Guidance**

***Premium revenue guidance for the full year is unchanged and expected to be approximately $42 billion, an increase of approximately 9% from the full year 2024.***

***The Company expects its full year GAAP earnings in 2025 to be at least $22.32 per share and reaffirms its full year adjusted earnings in 2025 to be at least $24.50 per share, representing 8% growth over the full year 2024.***

24.    On April 23, 2025, the Company submitted its quarterly report for the period ended March 31, 2025 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The report further stated the alleged results of the Company's change in medical claims and benefits payable for the fiscal year, as follows, in relevant part:

| | Three Months Ended March 31, 2025 | | | | |
|---|---|---|---|---|---|
| | **Medicaid** | **Medicare** | **Marketplace** | **Other** | **Consolidated** |
| | (In millions) | | | | |
| Medical claims and benefits payable, beginning balance | $ 3,667 | $ 722 | $ 251 | $ — | $ 4,640 |
| Components of medical care costs related to: | | | | | |
| Current year | 7,495 | 1,352 | 795 | 23 | 9,665 |
| Prior years | (156) | (56) | 26 | — | (186) |
| Total medical care costs | 7,339 | 1,296 | 821 | 23 | 9,479 |
| Payments for medical care costs related to: | | | | | |
| Current year | 4,593 | 721 | 458 | 17 | 5,789 |
| Prior years | 2,760 | 623 | 287 | 14 | 3,684 |
| Total paid | 7,353 | 1,344 | 745 | 31 | 9,473 |
| Acquired balances, net of post-acquisition adjustments | — | 122 | 88 | 35 | 245 |
| Change in non-risk and other payables | (87) | — | — | — | (87) |
| Medical claims and benefits payable, ending balance | $ 3,566 | $ 796 | $ 415 | $ 27 | $ 4,804 |

\*                    \*                    \*

***The favorable prior year development recognized in the three months ended March 31, 2025 was primarily attributable to reserving under moderately adverse conditions, lower than expected utilization of medical services by our members and improved operating performance,*** mainly in the Medicaid segment. Consequently, the ultimate costs recognized in 2025, as claims payments were processed, were lower than our estimates in 2024.

25.    The above statements identified in ¶¶ 19-24 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) material, adverse facts concerning the Company's "medical cost trend assumptions;" (2) that Molina was experiencing a "dislocation between premium rates and medical cost trend;" (3) that Molina's near term growth was dependent on a lack of "utilization of behavioral health, pharmacy, and inpatient and outpatient services;" (4) as a result of the foregoing, Molina's financial guidance for fiscal year 2025 was substantially likely to be cut; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

26.    On July 7, 2025, before the market opened, Molina issued a press release announcing financial results for the second quarter of 2025 and slashing full year 2025 adjusted earnings per share guidance. The press release revealed the Company's

second quarter 2025 adjusted earnings of approximately $5.50 per share, which was "***below its prior expectations***" due to "***medical cost pressures in all three lines of business***." The Company announced it "expects these medical cost pressures to continue into the second half of the year" and cut guidance for expected adjusted earnings per share 10.2% at the midpoint, from "at least $24.50 per share" to a "range of $21.50 to $22.50 per share." The press release revealed Molina was experiencing a "short-term earnings pressure" from a "***dislocation between premium rates and medical cost trend which has recently accelerated.***" Specifically, the press release stated as follows, in relevant part:

**Molina Healthcare Announces Preliminary Second Quarter Financial Results and Updates Fiscal Year 2025 Earnings Per Share Guidance**

**Long Beach, Calif., July 7, 2025** – Molina Healthcare, Inc. (NYSE: MOH) today announced preliminary financial results for the second quarter of 2025 and updated its full year 2025 adjusted earnings per share guidance. The Company's announcement of preliminary results was driven by recent market dynamics and off-cycle disclosures from others in the managed health care sector.

The Company now expects its second quarter 2025 adjusted earnings to be approximately $5.50 per share[1], which is modestly below its prior expectations. This preliminary result reflects medical cost pressures in all three lines of business. The Company expects these medical cost pressures to continue into the second half of the year. As a result, the Company now expects its full year 2025 adjusted earnings to be in the range of $21.50 to $22.50 per share[1], reflecting a consolidated pre-tax margin of just under 4%, the low-end of its long-term guidance range.

"The short-term earnings pressure we are experiencing results from what we believe to be a temporary dislocation between premium rates and medical cost trend which has recently accelerated," said Joseph Zubretsky, President and Chief Executive Officer. "As we are still performing near our long-term target ranges, nothing, including the potential impacts of the budget bill, has changed our outlook for the long-term performance of the business."

As previously announced, the Company expects to report its full second quarter results after the market closes on Wednesday, July 23, 2025, and will host a conference call and webcast to discuss the earnings release on Thursday, July 24, 2025, at 8:00 a.m. Eastern Time.

27.    On this news, Molina's stock price fell $6.97, or 2.9%, to close at $232.61 per share on July 7, 2025, on unusually heavy trading volume.

28.    The above statements identified in ¶ 26 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) material, adverse facts concerning the Company's "medical cost trend assumptions;" (2) that Molina's near term growth was dependent on a lack of "utilization of behavioral health, pharmacy, and inpatient and outpatient services;" (3) as a result of the foregoing, Molina's financial guidance for fiscal year 2025 was substantially likely to be cut; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Disclosures at the End of the Class Period**

29.    On July 23, 2025, after the market closed, Molina issued a press release reporting its financial results for the second quarter ended June 30, 2025 and further slashing the Company's full-year 2025 earnings guidance. The press release revealed, in part, that the Company's "GAAP net income was $4.75 per diluted share for the second quarter of 2025, a decrease of 8% year over year;" and it "***now expects its full year 2025 adjusted earnings to be no less than $19.00 per diluted share.***" This represented another 13.6% cut to guidance for earnings per share at the midpoint, from the cut to guidance announced less than two weeks earlier. The Company also cut its guidance for its full year 2025 GAAP net income 27% to $912 million. The Company attributed its results a full year outlook to a "challenging medical cost trend environment," including mere "***utilization of behavioral health, pharmacy, and inpatient and outpatient services.***" The Company alleged its guidance cut also reflected "new information gained in the quarterly closing process."  Specifically, the press release stated as follows, in relevant part:

**Molina Healthcare Reports Second Quarter 2025 Financial Results**

*Revises Full Year 2025 Guidance*

Long Beach, Calif, July 23, 2025 – Molina Healthcare, Inc. (NYSE: MOH) (the "Company") today reported second quarter 2025 GAAP earnings per diluted share of $4.75 and adjusted earnings per diluted share of $5.48. Financial results are summarized below:

| | Three months ended June 30, | | Six months ended June 30, | |
|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 |
| *(In millions, except per-share results)* | | | | |
| Premium Revenue | $10,868 | $9,446 | $21,496 | $18,950 |
| Total Revenue | $11,427 | $9,880 | $22,574 | $19,811 |
| **GAAP:** | | | | |
| Net Income | $255 | $301 | $553 | $602 |
| EPS – Diluted | $4.75 | $5.17 | $10.19 | $10.33 |
| Medical Care Ratio (MCR) | 90.4 % | 88.6 % | 89.8 % | 88.6 % |
| G&A Ratio | 6.2 % | 7.0 % | 6.6 % | 7.1 % |
| After-tax Margin | 2.2 % | 3.0 % | 2.4 % | 3.0 % |
| **Adjusted:** | | | | |
| Net Income | $294 | $341 | $627 | $675 |
| EPS – Diluted | $5.48 | $5.86 | $11.56 | $11.59 |
| G&A Ratio | 6.1 % | 6.9 % | 6.4 % | 7.0 % |
| After-tax Margin | 2.6 % | 3.5 % | 2.8 % | 3.4 % |

## Quarter Highlights

•As of June 30, 2025, the Company served approximately 5.7 million members, an increase of 167,000 members compared to June 30, 2024.

•Premium revenue was approximately $10.9 billion for the second quarter of 2025, an increase of 15% year over year.

•GAAP net income was $4.75 per diluted share for the second quarter of 2025, a decrease of 8% year over year.

•Adjusted net income was $5.48 per diluted share for the second quarter of 2025, a decrease of 6% year over year.

•***The Company now expects its full year 2025 adjusted earnings to be no less than $19.00 per diluted share and reaffirms its premium revenue guidance of approximately $42 billion.***

•New store embedded earnings remain at $8.65 per diluted share.

"Our second quarter results and revised full year outlook reflect a challenging medical cost trend environment," said Joseph Zubretsky, President and Chief Executive Officer. "The current earnings pressure we are experiencing results from what we believe to be a temporary dislocation between premium rates and medical cost trend which has recently accelerated. We are still performing near our long-term target ranges, and nothing has changed our outlook for the long-term performance of the business."

\*                    \*                    \*

## 2025 Guidance

Premium revenue guidance for the full year is unchanged and expected to be approximately $42 billion, an increase of approximately 9% from the full year 2024.

The Company now expects its full year 2025 GAAP earnings to be no less than $16.90 per diluted share and its full year 2025 adjusted earnings to be no less than $19.00 per diluted share. The updated guidance, which is disproportionately attributed to Marketplace, reflects new information gained in the quarterly closing process and implications for medical cost trend assumptions for the second half of the year.

Guidance metrics are summarized below:

| Full Year 2025 Guidance | |
|---|---|
| Premium Revenue | $42.0B |
| Total Revenue | $44.0B |
| GAAP Net Income | $912M |
| Adjusted Net Income | $1,028M |
| GAAP EPS – Diluted | ≥ $16.90 |
| Adjusted EPS – Diluted | ≥ $19.00 |
| Diluted weighted average shares | 54.1M |
| MCR | 90.2% |
| Medicaid | 90.9% |
| Medicare | 90.0% |
| Marketplace | 85.1% |
| GAAP G&A Ratio | 6.7% |
| Adjusted G&A Ratio | 6.6% |
| Effective Tax Rate | 25.3% |
| GAAP Pre-tax Margin | 2.8% |
| Adjusted Pre-tax Margin | 3.1% |

30.    On this news, Molina's stock price fell $32.03, or 16.84%, to close at $158.22  per share on July 24, 2025, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

31.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Molina securities between February 5, 2025 and July 23, 2025, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

32.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Molina's shares actively traded on the

NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Molina shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Molina or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

33.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

34.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

35.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Molina; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

36.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it

1  impossible for members of the Class to individually redress the wrongs done to them.

2  There will be no difficulty in the management of this action as a class action.

3  ## UNDISCLOSED ADVERSE FACTS

4  37.    The market for Molina's securities was open, well-developed and

5  efficient at all relevant times.  As a result of these materially false and/or misleading

6  statements, and/or failures to disclose, Molina's securities traded at artificially

7  inflated prices during the Class Period.  Plaintiff and other members of the Class

8  purchased or otherwise acquired Molina's securities relying upon the integrity of the

9  market price of the Company's securities and market information relating to Molina,

10  and have been damaged thereby.

11  38.    During the Class Period, Defendants materially misled the investing

12  public, thereby inflating the price of Molina's securities, by publicly issuing false

13  and/or misleading statements and/or omitting to disclose material facts necessary to

14  make Defendants' statements, as set forth herein, not false and/or misleading.  The

15  statements and omissions were materially false and/or misleading because they failed

16  to disclose material adverse information and/or misrepresented the truth about

17  Molina's business, operations, and prospects as alleged herein.

18  39.    At all relevant times, the material misrepresentations and omissions

19  particularized in this Complaint directly or proximately caused or were a substantial

20  contributing cause of the damages sustained by Plaintiff and other members of the

21  Class.  As described herein, during the Class Period, Defendants made or caused to

22  be made a series of materially false and/or misleading statements about Molina's

23  financial well-being and prospects.  These material misstatements and/or omissions

24  had the cause and effect of creating in the market an unrealistically positive

25  assessment of the Company and its financial well-being and prospects, thus causing

26  the Company's securities to be overvalued and artificially inflated at all relevant

27  times.  Defendants' materially false and/or misleading statements during the Class

28  Period resulted in Plaintiff and other members of the Class purchasing the Company's

securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

40.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

41.    During the Class Period, Plaintiff and the Class purchased Molina's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

42.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Molina, their control over, and/or receipt and/or modification of Molina's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Molina, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

43.    The market for Molina's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Molina's securities traded at artificially inflated

1  prices during the Class Period.  On April 3, 2025 the Company's stock price closed

2  at a Class Period high of $353.24 per share. Plaintiff and other members of the Class

3  purchased or otherwise acquired the Company's securities relying upon the integrity

4  of the market price of Molina's securities and market information relating to Molina,

5  and have been damaged thereby.

6       44.    During the Class Period, the artificial inflation of Molina's shares was

7  caused by the material misrepresentations and/or omissions particularized in this

8  Complaint causing the damages sustained by Plaintiff and other members of the Class.

9  As described herein, during the Class Period, Defendants made or caused to be made

10  a series of materially false and/or misleading statements about Molina's business,

11  prospects, and operations.  These material misstatements and/or omissions created an

12  unrealistically positive assessment of Molina and its business, operations, and

13  prospects, thus causing the price of the Company's securities to be artificially inflated

14  at all relevant times, and when disclosed, negatively affected the value of the

15  Company shares.  Defendants' materially false and/or misleading statements during

16  the Class Period resulted in Plaintiff and other members of the Class purchasing the

17  Company's securities at such artificially inflated prices, and each of them has been

18  damaged as a result.

19       45.    At all relevant times, the market for Molina's securities was an efficient

20  market for the following reasons, among others:

21            (a)    Molina shares met the requirements for listing, and was listed and

22  actively traded on the NYSE, a highly efficient and automated market;

23            (b)    As a regulated issuer, Molina filed periodic public reports with the

24  SEC and/or the NYSE;

25            (c)    Molina regularly communicated with public investors via

26  established market communication mechanisms, including through regular

27  dissemination of press releases on the national circuits of major newswire services

28

1  and through other wide-ranging public disclosures, such as communications with the

2  financial press and other similar reporting services; and/or

3          (d)    Molina was followed by securities analysts employed by

4  brokerage firms who wrote reports about the Company, and these reports were

5  distributed to the sales force and certain customers of their respective brokerage firms.

6  Each of these reports was publicly available and entered the public marketplace.

7          46.    As a result of the foregoing, the market for Molina's securities promptly

8  digested current information regarding Molina from all publicly available sources and

9  reflected such information in Molina's share price. Under these circumstances, all

10  purchasers of Molina's securities during the Class Period suffered similar injury

11  through their purchase of Molina's securities at artificially inflated prices and a

12  presumption of reliance applies.

13          47.    A Class-wide presumption of reliance is also appropriate in this action

14  under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*,

15  406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on

16  Defendants' material misstatements and/or omissions.  Because this action involves

17  Defendants' failure to disclose material adverse information regarding the Company's

18  business operations and financial prospects—information that Defendants were

19  obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All

20  that is necessary is that the facts withheld be material in the sense that a reasonable

21  investor might have considered them important in making investment decisions.

22  Given the importance of the Class Period material misstatements and omissions set

23  forth above, that requirement is satisfied here.

24                        **<u>NO SAFE HARBOR</u>**

25          48.    The statutory safe harbor provided for forward-looking statements under

26  certain circumstances does not apply to any of the allegedly false statements pleaded

27  in this Complaint. The statements alleged to be false and misleading herein all relate

28  to then-existing facts and conditions. In addition, to the extent certain of the

statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Molina who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

49.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

50.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Molina's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

51.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of

the Company's securities in an effort to maintain artificially high market prices for Molina's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

52.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Molina's financial well-being and prospects, as specified herein.

53.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Molina's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Molina and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

54.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other

members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

55.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Molina's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

56.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Molina's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired

Molina's securities during the Class Period at artificially high prices and were damaged thereby.

57.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Molina was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Molina securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

58.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

59.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

60.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

61.     Individual Defendants acted as controlling persons of Molina within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company,

including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

62.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

63.    As set forth above, Molina and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

1

## **<u>JURY TRIAL DEMANDED</u>**

2     Plaintiff hereby demands a trial by jury.

3

4 DATED:  October 3, 2025        **GLANCY PRONGAY & MURRAY LLP**

5             By:   */s/ Charles H. Linehan*

6             Robert V. Prongay

            Charles H. Linehan

7             Pavithra Rajesh

            1925 Century Park East, Suite 2100

8             Los Angeles, California 90067

9             Telephone:  (310) 201-9150

            Facsimile:  (310) 201-9160

10             Email:  clinehan@glancylaw.com

11

12             *Counsel for Plaintiff Jeffrey Hindlemann*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SWORN CERTIFICATION OF PLAINTIFF**
**MOLINA HEALTHCARE, INC. (MOH) SECURITIES LITIGATION**

I, Jeffrey Hindlemann, certify that:

1.      I have reviewed the Complaint, adopt its allegations, and authorize its filing and/or the filing of a lead plaintiff motion on my behalf.

2.      I did not purchase the Molina Healthcare, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.      I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.      My transactions in Molina Healthcare, Inc. securities during the period set forth in the Complaint are as follows:

        (See attached transactions)

5.      I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6.      I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.


I declare under penalty of perjury that the foregoing are true and correct statements.


10/3/2025
_____
Date

_____
Jeffrey Hindlemann

### Jeffrey Hindlemann's Transactions in Molina Healthcare, Inc. (MOH)

#### Account 1 (ROTH)

| Settlement Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 7/9/2025 | Bought | 7 | $230.0000 |
| 7/10/2025 | Sold | -7 | $235.2500 |
| 7/21/2025 | Bought | 3 | $190.8000 |
| 7/21/2025 | Bought | 4 | $192.2000 |
| 7/21/2025 | Bought | 10 | $197.5000 |
| 7/24/2025 | Sold | -17 | $185.8000 |

#### Account 2 (Individual)

| Settlement Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 7/3/2025 | Bought | 10 | $241.0000 |
| 7/10/2025 | Bought | 5 | $227.9000 |
| 7/14/2025 | Bought | 5 | $222.7000 |
| 7/14/2025 | Bought | 5 | $224.6500 |
| 7/15/2025 | Bought | 5 | $218.2500 |
| 7/17/2025 | Bought | 1 | $213.2500 |
| 7/17/2025 | Bought | 4 | $213.2500 |
| 7/18/2025 | Bought | 5 | $204.5000 |
| 7/18/2025 | Bought | 5 | $208.0000 |
| 7/24/2025 | Sold | -45 | $185.7500 |