ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ (147029)
LUCAS F. OLTS (234843)
MATTHEW I. ALPERT (238024)
JACK ABBEY GEPHART (345398)
JACK K. SCOTT (363886)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
lolts@rgrdlaw.com
malpert@rgrdlaw.com
jgephart@rgrdlaw.com
jscott@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JEFFREY HINDLEMANN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> MOLINA HEALTHCARE, INC., et al., <br><br> Defendants. | Case No. 2:25-cv-09461-SPG-RAO <br><br> CLASS ACTION <br><br> CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br> DEMAND FOR JURY TRIAL |

4925-9384-8205.v2

## TABLE OF CONTENTS

**Page**

I.      Introduction and Overview........................................................................... 1

II.     Jurisdiction and Venue ................................................................................. 5

III.    Parties ........................................................................................................... 6

IV.     Background and Other Relevant Facts.......................................................... 8

        A.      The Company.................................................................................... 8

                1.      Molina's Medicaid Business Segment................................ 9

                2.      Molina's Medicare Business Segment .............................. 10

                3.      Molina's Marketplace Business Segment ......................... 11

        B.      Defendants' Misrepresentations About Their Ability to
                Manage Utilization, Control Medical Costs, and Maintain
                Its MLR Were Material to Investors ............................................ 11

V.      Defendants' Material Misrepresentations to Investors Regarding the
        Company's Ability to Effectively Predict and Manage Its Medical
        Costs .......................................................................................................... 14

                1.      Molina's 3Q24 Financial Results..................................... 14

                2.      Molina's November 8, 2024 Investor Day
                        Presentation ..................................................................... 15

                3.      Molina's Fiscal Year 2024 Financial Results ................. 17

                4.      Molina's 1Q25 Financial Results..................................... 18

                5.      Molina's Preliminary 2Q25 Financial Results................. 21

                6.      Molina's 2Q25 Financial Results..................................... 22

                7.      Molina's 3Q25 Financial Results..................................... 25

VI.     The Truth Is Revealed ................................................................................ 28

VII.    Additional Allegations of Scienter............................................................ 30

        A.      Defendants' False and/or Misleading Statements
                Concerned Molina's Core Operations .......................................... 31

        B.      The Individual Defendants Publicly Held Themselves
                Out to Investors as Knowledgeable About the Core
                Operations of the Company that Involved the Fraud .............. 31

4925-9384-8205.v2

**Page**

     C.     Defendant Zubretsky's Suspiciously-Timed Insider Stock Sales for More than $28 Million in Proceeds Support a Motive to Commit Fraud ................................................................32

     D.     The Individual Defendants' SOX Certifications and Signing of SEC Filings Supports Scienter................................33

     E.     Corporate Scienter ................................................................35

VIII.  Loss Causation/Economic Loss ....................................................36

IX.    Class Action Allegations................................................................40

X.     Applicability of the Presumption of Reliance..................................42

XI.    Claims for Relief ...........................................................................42

XII.   Prayer for Relief ...........................................................................46

XIII.  Demand for Jury Trial....................................................................46

4925-9384-8205.v2

Lead Plaintiff Automotive Industries Pension Trust Fund (the "Pension Fund" or "Plaintiff") hereby brings this action on behalf of itself and all persons or entities who purchased or otherwise acquired Molina Healthcare, Inc. ("Molina" or the "Company") securities between October 23, 2024 and February 6, 2026, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Excluded from the Class are Defendants, as defined below, present or former executive officers and directors of Molina and their immediate family members (as defined in 17 C.F.R. §229.404(1)(a)(iii) and (1)(b)(ii)). Plaintiff seeks to recover damages caused by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder.

Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters. Plaintiff's information and belief is based on, *inter alia*, the independent investigation of Plaintiff's counsel, Robbins Geller Rudman & Dowd LLP. This investigation included, but was not limited to, a review and analysis of: (i) Molina's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) transcripts of Molina's public conference calls; (iii) press releases; (iv) independent media reports regarding Molina; (v) economic analyses of the Company's stock price movement and pricing and volume data; (vi) other publicly available material and data identified herein; and (vii) information obtained from former employees of the Company. Plaintiff's investigation of the alleged fraud continues.

## I.    Introduction and Overview

1.    This securities class action arises from Defendants' repeated false and/or misleading statements concerning Molina's purported ability to accurately predict, manage, and control medical utilization and medical costs – the core drivers of the Company's profitability. Molina provides health insurance primarily to low-income individuals through government-sponsored programs, including Medicaid, Medicare, and Affordable Care Act Marketplace plans. The Company receives fixed per-

- 1 -

4925-9384-8205.v2

member per-month payments from government agencies and assumes the financial risk of providing healthcare services to its members.  Molina's profitability depends, almost entirely, on accurately forecasting medical utilization and managing healthcare costs so that claims expenses remain below the premiums it receives.

2.     Throughout the Class Period, Defendants publicly assured investors that Molina possessed sophisticated actuarial models, disciplined medical expense management protocols, and reliable rate-setting mechanisms that enabled it to forecast utilization trends and maintain stable medical cost ratios ("MCR") and medical loss ratios ("MLR").  These representations were materially false and misleading.

3.     In reality, Defendants' models and data could not sufficiently forecast utilization trends and Molina did not have the ability to effectively predict or control escalating medical costs across Molina's Medicaid, Medicare, and Marketplace businesses.  As a result, the Company's financial projections – including earnings per share ("EPS"), MCR, and MLR guidance – were not grounded in reliable data or reasonable assumptions.  Rather than reflecting a stable and predictable cost environment, Molina's operations were increasingly subject to volatile and accelerating utilization trends that Defendants either intentionally ignored or recklessly disregarded.

4.     Because Molina's business model fundamentally depends on its ability to estimate medical costs, accurate projections of utilization and medical costs are critical.  Even modest deviations in utilization rates can materially impact claims expenses, compress margins, and erode profitability.  Throughout the Class Period, investors heard Defendants repeatedly praise Molina's actuarial processes and cost control mechanisms, claiming that it allowed the Company to "effectively manage" utilization and maintain predictable financial performance.  Before and throughout the Class Period, Defendants' proclaimed that "*[w]e are confident that the requirement for actuarially sound rates will offset trends as they may emerge*," that we "*continue to effectively manage the elevated utilization through our cost control protocols*"

- 2 -

and that "*[w]e are confident our cost control protocols and procedures continue to be effective albeit applied to much higher intake volumes*."[1]

5.  Defendants also emphasized the Company's "data-driven" and "empirical" approach to forecasting utilization and managing costs.  They claimed that Molina's "very detailed models" were built "from the bottoms up," supported by historical experience and real-time data, and capable of accurately capturing trends across its diverse membership base.  Defendants further touted their ability to rely on actuarially sound rates and risk corridor protections to offset any temporary fluctuations in utilization or cost trends.  These statements materially misled investors that Molina possessed both the insight and the operational discipline necessary to maintain stable margins and accurately project EPS despite evolving market conditions.

6.  Unbeknownst to investors, Defendants did not, in fact, have the ability to reliably forecast utilization or control medical costs – making Defendants' representations to the contrary materially false and/or misleading.  As later revealed, Molina was experiencing significant and sustained increases in utilization across all lines of business, including behavioral health services, pharmacy costs, inpatient and outpatient care, and services for high-acuity members.  These trends were not transient or fully offset by rate adjustments, as Defendants had claimed, but instead reflected systemic pressures that materially undermined the Company's financial performance.

7.  The truth began to emerge through a series of partial corrective disclosures that exposed the Company's inability to accurately project medical utilization and costs.  On July 23, 2025, Molina announced that it was lowering its full-year 2025 EPS guidance due to "medical cost pressures in all three lines of business," driven by elevated utilization.  This disclosure shocked investors, causing the Company's stock price to drop by over 16% the following trading day.

---

[1]  Unless otherwise noted, emphasis is added and citations omitted throughout.

- 3 -

4925-9384-8205.v2

8.      Just three months later, on October 22, 2025, Molina again reduced its guidance, citing continued and worsening utilization trends and a higher-than-expected MLR across its segments. Defendants acknowledged that medical cost trends had exceeded prior expectations, forcing further revisions to earnings projections. Following this announcement, Molina's stock price plunged an additional 19.2%.

9.      Finally, on February 5, 2026, Defendants revealed that the Company's financial condition was far worse than previously disclosed.  Molina reported that its 2025 results had fallen significantly below even its reduced guidance and issued dramatically lowered projections for 2026, attributing the deterioration to persistently high utilization across its businesses.  This disclosure confirmed that Defendants had failed to understand or control the very cost drivers they had repeatedly assured investors were well-managed.  In response, Molina's stock price again plummeted nearly 30% in a single day.

10.      These disclosures revealed a stark fact: Defendants had been materially misrepresenting to investors their ability to predict and manage medical utilization and costs, and as a result, had issued financial guidance that had no reasonable basis and was repeatedly and dramatically inaccurate.  The Company's earnings projections were materially revised downward three times in rapid succession, each time due to the same underlying issue – failure to control increases in utilization, medical costs, and MLR.

11.      Defendants knew or recklessly disregarded that their statements regarding Molina's predictive capabilities and cost management were false and/or misleading.  As senior executives responsible for the Company's core operations, the Individual Defendants took a hands-on approach to running the day to day operations. As Chief Executive Officer ("CEO") Joseph M. Zubretsky ("Zubretsky") and Chief Financial Officer ("CFO") Mark L. Keim ("Keim") told investors during Molina's November 8, 2024 Investor Day:

- 4 -

4925-9384-8205.v2

Joe [Zubretsky], the only thing I'd add is what I always say about Molina *is we're big enough to be relevant in all the big company ways, yet we're small enough that we really run it in a very hands-on way. It's very personal to us*.  If Molina were part of any of our big competitors, we would just be a division without maybe the same ownership that this management team runs this company with.

12.     Zubretsky represented himself as a hands-on head-coach of "my team," proudly highlighting to investors how the Company focuses "on the fundamentals," "*we stay true to our playbook*," "we have a balanced view of our constituencies," and "*I'll staff this team up against anybody in the industry*."  Both before and during the Class Period, Zubretsky and Keim – Molina's top two executives – made it clear that they were not just the Company's public spokespersons on earnings conference calls or at investor day events, but rather were hands-on leaders with a detailed and intricate knowledge of Molina's inner workings such as its "very detailed models" and the "empirical data" that was the foundation for the Company's "fact-based" "plan."  The CEO and CFO claimed they knew "brick by brick, block by block, how this plan is built to deliver the results we say we're going to deliver."

13.     In all, disclosure of the truth concealed by Defendants' false and misleading statements caused *Molina's stock price to plummet 63% from its Class Period high* of over $359 per share to less than $132, *a decline of over $228 per share*.

## II.     Jurisdiction and Venue

14.     The claims asserted herein arise pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated by the SEC (17 C.F.R. §240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and §27 of the Exchange Act (15 U.S.C. §78aa).

15.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act (15 U.S.C. §78aa), as conduct constituting the alleged Exchange

- 5 -

4925-9384-8205.v2

Act violations occurred in this District, including alleged misstatements made in this District, and damages took place in this District.

16.    Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of the national securities exchange, to conduct the unlawful acts and wrongs alleged herein.

**III.    Parties**

17.    Plaintiff is a pension fund, located in Dublin, California, providing retirement income security for employees who work for contributing employers within the automotive industry.  Plaintiff manages approximately $2 billion in assets for the benefit of more than 20,000 participants, retirees, and beneficiaries.  Plaintiff made transactions in Molina Securities during the Class Period and suffered economic losses as a result of Defendants' alleged unlawful conduct.  *See* Exhibit A, attached hereto.

18.    Defendant Molina is a health insurance provider which administers public and private health insurance plans to its customers nationwide.  The Company is incorporated in Delaware, and its principal place of business is located at 200 Oceangate, Suite 100, Long Beach, California 90802.  Throughout the Class Period, Molina's stock traded in an efficient market on the New York Stock Exchange ("NYSE") under the ticker "MOH."

19.    Defendant Zubretsky has served as the Company's CEO and President of the Company's Board of Directors since November of 2017.  Prior to joining Molina, Zubretsky held executive roles at several other insurance companies, and has more than 35 years of executive experience in the insurance industry.  During the Class Period, Zubretsky spoke often to investors about Molina's business and as CEO, was the senior-most officer at the Company.  Zubretsky had ultimate responsibility over Molina's performance and operations.  He also had approval over and was a signatory to Molina's SEC reporting, signing all SEC filings and submitting certifications

- 6 -

4925-9384-8205.v2

pursuant to the Sarbanes-Oxley Act of 2022 ("SOX") affirming the accuracy of the financial statements and the adequacy of Molina's internal controls.  After not selling any stock for the 21 months prior to the Class Period, Zubretsky engaged in suspicious sales of Molina stock in April 2025 (during the same quarter the Company began its first in a series of massive EPS guidance revisions shocking the market), dumping almost 23% of his total holdings for proceeds totaling more than $28 million.  Zubretsky received his license as a Certified Public Accountant in Connecticut in 1983, though his license is now inactive.

20.    Defendant Keim joined Molina in 2018 and has served as the Company's CFO and Senior Executive Vice President since February of 2021.  During the Class Period, Keim spoke often to investors about Molina's business and, in addition to Zubretsky, was a signatory to the Molina's SEC reporting, signing all SEC filings and submitting certifications pursuant to SOX affirming the accuracy of the financial statements and the adequacy of Molina's internal controls.  According to Molina's website, Keim "leads the Company's Medicaid Health Plans and Marketplace Business."  In September 2024, according to an article published online by *Healthcare Dive*, Keim took "the reins of the health insurer's bread-and-butter business – Medicaid – along with a growing marketplace division."  In the Company's September 4, 2024 press release announcing Keim's expanded role, Zubretsky praised Keim as "an extraordinary leader not only in the realm of finance, but also in strategic development and operations."

21.    Defendants Zubretsky and Keim are collectively referred to herein as the "Individual Defendants."  Molina, together with the Individual Defendants, are collectively referred to herein as the "Defendants."

22.    The Individual Defendants possessed the power and authority to control the contents of Molina's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Molina's SEC filings and press releases alleged herein to be misleading prior to or shortly after

- 7 -

their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions within Molina, and their access to material information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false or misleading. The Individual Defendants, along with Molina pursuant to the doctrine of *respondeat superior*, are liable for the Exchange Act violations pleaded herein.

## IV.    Background and Other Relevant Facts

### A.    The Company

23.    Molina was founded in 1980 by Dr. C. David Molina, an emergency medicine physician in Long Beach, California. Dr. Molina opened Molina Medical Centers as a community clinic, but shifted into a managed care company in early 1990s, and expanded into multi-state Medicaid managed care company by early 2000s. By 2003, Molina was making over $1 billion in revenue, and went public in July 2003, listing on the NYSE under the ticker symbol MOH. Through the acquisition of other plans and continued expansion, Molina reached over $4 billion in revenue and thousands of employees by 2010. In FY24, Molina reported over $40 billion in revenue, which increased to over $45 billion in FY25.[2]

24.    As a healthcare insurance provider through both private and government-funded plans, Molina's ability to control its medical costs is key to its business. The three core metrics in evaluating medical costs are medical utilization, MCR, and MLR.

25.    ***Medical utilization*** is the metric that tracks each members' interactions with the healthcare system, such as how many times a patient goes to the doctor.

---

[2]    As used herein, "FY" means the Company's fiscal year (*e.g.*, FY24 means fiscal year 2024). Molina's fiscal year begins on January 1 and ends on December 31. Specific quarters in a FY are designated by the quarter number followed by the letter Q. Thus, 4Q25 indicates Molina's fourth quarter in fiscal year 2025.

- 8 -

4925-9384-8205.v2

Higher utilization of medical services drives an increase in total medical costs, compresses margins, and reduces cash flow.  Thus, a higher medical utilization rate results in higher claims paid per member, tighter margins and lower profits for an insurer such as Molina.

26.    *MCR* and *MLR* are similar metrics that show an insurer's ability to control expenses and operate efficiently.  MCR is the proportion of premium revenues spent on medical claims and healthcare services, while MLR also factors in expenses related to improving healthcare quality.  Thus, MLR is the proportion of premium revenues spent on medical services and quality improvement.  The federal government sets statutory floors for MLR in Medicaid, Medicare, and Marketplace to ensure that a certain percentage of premium revenues are spent on medical care and quality treatments, instead of being pocketed as profit or spent on administrative costs.  This statutory floor ranges from 80-85% depending on program and plan size.  However, in Medicaid and Marketplace, states are able to set higher statutory minimums for MLR.  To seek the highest potential profits, Molina is incentivized to maintain an MLR as close as possible to the applicable statutory floor and manage its overall medical costs.

27.    The Company's three reportable business segments that account for all significant revenue are: (1) Medicaid; (2) Medicare; and (3) Marketplace.

### 1.    Molina's Medicaid Business Segment

28.    Medicaid, a government program, provides healthcare and long-term services and support to low-income Americans.  Although jointly funded by federal and state governments, Medicaid is state-operated and state-implemented, which allows states significant flexibility to structure their own programs.  Most states have contracted with managed care plans to provide Medicaid services to its residents.  States have elected to do this to meet their own objectives, including to increase budget predictability, constrain spending, and improve access to care and value.  State government agencies pay Medicaid health plans per-member per-month rates that vary by state, line of business, demographics, and in most instances health risk factors, in

- 9 -

return for the health plans providing services to members and assuming the associated medical and administrative costs. Molina is one such Medicaid managed care plan, contracting with states to provide Medicaid benefits to qualified beneficiaries.

29. Molina is the fourth-largest Medicaid insurer, with a 6% market share as of February 2026. Molina's Medicaid segment had over 4.8 million members in 2024, which decreased slightly to 4.5 million members in 2025. In 2024, the segment brought in over $30 billion in premium revenue, totaling 79% of the Company's overall premium revenue. While, in 2025, the segment accounted for $32 billion in premium revenue, totaling 75% of the Company's overall premium revenue. Molina participates in a variety of Medicaid programs including Temporary Assistance for Needy Families; Medicaid Aged, Blind or Disabled; Children's Health Insurance Program; Medicaid Expansion; and Long-Term Services and Supports ("LTSS").

**2.    Molina's Medicare Business Segment**

30. Medicare is a federal program that provides eligible persons age 65 and over, and some disabled persons, with a variety of hospital, medical insurance, and prescription drug benefits. Medicare is funded by Congress, and the program is administered by the Centers for Medicare & Medicaid Services ("CMS"). Over 12 million low-income elderly and disabled people qualify for both Medicare and Medicaid programs ("dual eligible" individuals). For such dual eligible individuals, Medicare is their primary source for health insurance coverage, while Medicaid pays for services that Medicare does not cover. As with Medicaid, Molina contracts with the Federal Government to provide Medicare benefits to eligible individuals on behalf of the government.

31. Molina's Medicare segment had 242,000 members in 2024 and 262,000 members in 2025. This segment accounted for over $5.5 billion in premium revenue in 2024, which increased in 2025 to $6.2 billion. The Company participates in a variety of Medicare programs including Medicare Advantage Part-D; Dual Eligible Special Needs Plan ("D-SNP"); Highly-Integrated Dual Special Needs Plans

- 10 -

4925-9384-8205.v2

("HIDE"); Fully-Integrated Dual Special Needs Plan; Coordination Only D-SNP; Chronic Special Needs Plan; and Medicare-Medicaid Plans.

### 3. Molina's Marketplace Business Segment

32. Marketplace was created by the Patient Protection and Affordable Care Act – often referred to as either the Affordable Care Act or the ACA – signed into law on March 23, 2010. Marketplace allowed individuals and small groups to purchase federally subsidized health insurance from a marketplace insurance exchange beginning on January 1, 2014. Marketplace plans must comply with the ACA by meeting standards established by the federal government, including a requirement to cover certain essential health benefits. Healthcare Marketplace operates in all 50 states and the District of Columbia, but the platform for each state can vary. Some states utilize the Federally Facilitated Marketplace, while other states operate their own State Based Marketplace. Companies submit premium rates during the spring of each year for policies effective in the following calendar year. The premium rates must comply with the rules and regulations of the ACA individual market including MLR thresholds.

33. Molina's Marketplace segment had 403,000 members in 2024 and 655,000 members in 2025. The segment accounted for over $2.5 billion in premium revenue in 2024 which increased significantly to $4.4 billion in 2025.

### B. Defendants' Misrepresentations About Their Ability to Manage Utilization, Control Medical Costs, and Maintain Its MLR Were Material to Investors

34. As a healthcare insurance provider through both private and government-funded plans, Molina's ability to control its medical costs and manage utilization rates, and thereby maintain an MLR as low as possible for its private plans (Marketplace), and as close to the statutory floor of 85% for its government-funded Medicare Advantage and Medicaid plans, is crucial to its financial health (both for the present and future).

- 11 -

4925-9384-8205.v2

35.    Both before and during the Class Period, Defendants underscored to investors that its use of actuarial models, historical experience, and state rate processes to forecast utilization and set pricing allowed it to manage increasing medical costs, accurately project utilization trends, and accurately provide MCR guidance.  For example, on February 8, 2024, Keim stated: "*We are confident that the requirement for actuarially sound rates will offset trends as they may emerge*."

36.    On July 25, 2024, Zubretsky told investors: "In fact, our results demonstrate that the principle of rate soundness works, and that Molina's unique rate corridor position protects against transient quarter-to-quarter fluctuations of rates and medical costs" and that "*[b]ut again, [no medical trends] out of the ordinary, and nothing that can't be dealt with, particularly as our corridor position absorbs these trends and then rates kick in to pick up the slack*."

37.     On July 24, 2025, Zubretsky assured investors that they could "*continue to effectively manage the elevated utilization through our cost control protocols*" and that "*[w]e are confident our cost control protocols and procedures continue to be effective albeit applied to much higher intake volumes*."  On that same call, Keim stated: "*We remain confident in our cost controls*."

38.    As late at October 23, 2025, Keim told investors: "Our third-quarter consolidated MCR was 92.6%, reflecting a continued challenging medical trend environment for each of our segments, *but was moderated by our consistently effective medical cost management*."  He also reassured the market that: "*We remain confident in the strength and consistency of our actuarial process and our reserve position even in this period of sustaining high trend*."

39.    Throughout the Class Period, financial analysts regularly published reports about Molina focusing heavily on the Company's MLR in its three main business sectors, and relied upon Defendants' statements about Molina's MLR to justify their investment theses placing Molina ahead of its peers.  The following

- 12 -

4925-9384-8205.v2

excerpts from analyst reports are illustrative of the financial importance that analysts placed on Defendants' statements:

(a) On November 10, 2024, Wells Fargo issued an analyst report titled: "Strong Track Record of Execution and Attractive Outlook, Legislative/Regulatory Risk is Key Overhang." Wells Fargo noted that the Company's "[e]xecution [h]as [b]een [s]trong. We continue to be most impressed by MOH's execution to drive best-in-class Medicaid MLRs . . . ." Wells Fargo also underscored the Company's claim from its November 8, 2024 Investor Day Presentation that "disciplined management of medical costs is the only differentiator."

(b) On April 23, 2025, Cantor Fitzgerald issued an analyst report that assigned an "overweight" rating to Molina's stock, and noted that its positive analysis was due to, in part, year-over-year increase in the Marketplace MLR and better-than-expected performance of the Company's Medicaid MLR. The Cantor Fitzgerald report further noted that they would be looking for additional information on the Company's Healthcare Exchange (Marketplace) MLR and the Company's Medicaid cost trend in comparison with 2025 expectations on the 1Q25 earnings call the following day.

(c) On April 24, 2025, following the Company's 1Q25 earnings call, TD Cowen issued an analyst report which increased their target price for Molina from $342 to $369. This increase was supported by the Company's assurances on the call that "FY MDCD [Medicaid] MLR is still expected at 89.9% . . . and MOH still expects an 89% MLR" in Medicare.

(d) On August 15, 2025, Wells Fargo rated Molina as "overweight" in comparison with struggling peers, noting that downside risk related to Molina's Medicaid MLR "does not appear as aggressive" as Centene, and noting that the Company's Medicaid business was "outperforming peers in this business."

40. Overall, the market's perception of the Company's ability to manage its medical costs better than peers led analysts to consistently view the Company as being

- 13 -

4925-9384-8205.v2

more resilient to the rising medical costs trend impacting the rest of Molina's competitors.

**V.    Defendants' Material Misrepresentations to Investors Regarding the Company's Ability to Effectively Predict and Manage Its Medical Costs[3]**

### 1.    Molina's 3Q24 Financial Results

41.    The Class Period begins on October 23, 2024, when Molina announced its financial results for the 3Q24 ended September 30, 2024 in a press release and on Form 8-K filed with the SEC (the "3Q24 Press Release").  The 3Q24 Press release contained the following statement: "***The Company reaffirmed its full year 2024 guidance*** with expected premium revenue of approximately $38 billion and ***adjusted earnings of at least $23.50 per diluted share***."

42.    Additionally, the 3Q24 Press Release stated:

> ***Adjusted earnings per diluted share for the full year is unchanged and expected to be at least $23.50, representing approximately 13% growth for the full year 2023.  Continued strong performance is due to Marketplace***, operating leverage, and higher net investment income are expected to offset the higher-than-expected trend in Medicaid and Medicare in the second half of the year.

43.    The following day, on October 24, 2024, Molina filed its quarterly report on Form 10-Q (the "3Q24 10-Q") with the SEC and held an earnings call with analysts and investors to discuss its third quarter financial results (the "3Q24 Earnings Call").  During the 3Q24 Earnings Call, Keim stated: "***We expect full-year Medicaid MCR of approximately 90%, up 70 basis points from our prior guidance***, reflecting higher cost trend approximately 10 basis points for the full-year impact of the third quarter retroactive premium adjustments in California."

---

[3]    Bolding and italics in §V are intended to emphasize which specific portion(s) of Defendants' representations to investors during the Class Period are alleged to be materially false or misleading in light of the entire surrounding context of the sentence and/or paragraph in which the representation is contained.

4925-9384-8205.v2

44.    Also during the 3Q24 Earnings Call, Zubretsky made the following statement in response to a question regarding the trends in medical costs relating to the Company's Medicare and Medicated businesses:

[Question]: [With respect to] your utilization trends that you're seeing and you called out the areas of Medicaid, it sound [sic] like you're seeing a little bit of that in Medicare. Just trying to parse out, are these just the way the market is at this point or you need to get that in your rate updates both for Medicaid or Medicare? Or is [sic] there medical management opportunities for you to push back on some of what you're seeing[?]

[Answer]: Well, I think it's all relative, right? Because we all get the same rates, we're all observing the same gross trend supply-driven, demand-driven. *We have proven on a sustainable basis that we are managing medical costs effectively*, otherwise, we would not have historically been 200 basis points deep into the corridors on average for the past three or four years.

45.    In response to an analyst's question regarding medical cost trends, Zubretsky stated:

The combination of rates, trend and corridors are the reason we're operating at 90% and not 89%. So it worked exactly the way we had predicted with corridors acting as a buffer until rates caught up, and that is happening. Now we're still cautious on the 1/1 rates, as I said before. *But the model is working exactly as we have predicted. The corridors act as a financial buffer, giving rates time to catch up with trend*.

### 2.    Molina's November 8, 2024 Investor Day Presentation

46.    In Molina's Investor Day Presentation filed with the SEC on November 8, 2024, Molina laid out long term growth targets for their three business segments and discussed Molina's target for MCR stating: "What We Will Do – The Next 3 Years. . . . 87.5% - 88.5% Medical Cost Ratio."

47.    The Investor Day Presentation also touted the "[n]umerous capabilities drive medical cost efficiencies with focus on high-acuity populations" which included:

- *State-of-the-art medical economics platform*

- *Utilization management*

- *High-acuity care management*

- FFS and value-based contracting

- Payment integrity

- 15 -

4925-9384-8205.v2

- Centers of Excellence for behavioral health, pharmacy, and LTSS.

48. In its Investor Day Presentation, Defendants commented on the Company's Medicaid margin sustainability, stating: "***Molina's sustainable, best in class margins [are] driven by continually outperforming total state populations***."

49. In the Investor Day Presentation, Molina discussed its ability to manage risk arising from fluctuating medical costs noting: "***Medicaid risk corridor positions are a result of margin outperformance and help mitigate potential inflections in medical cost trends***." The Company went on to state that:

- "Molina averaged ~200 basis points of risk corridor expense/protection over the past few years[.]"

- "In 2024, risk corridors absorbed higher medical costs due to Redetermination acuity shifts[.]"

- "We expect to use ~100 basis points of risk corridor buffer in 2024 as rates have not matched trend[.]"

- "Historical risk corridor protection level is expected to be replenished with the new rate cycle[.]"

50. In the Investor Day Presentation, Molina touted to investors that it "***has a clear formula to deliver organic premium growth and sustainable MCR to achieve pre-tax margins***."

51. Additionally, on November 8, 2024, Defendants spoke to investors at Molina Healthcare Investor Day. During his public comments, Zubretsky made the following statements regarding the Company's ability to deliver on its financial goals and projections:

We're in the right businesses, and we are going to stay in these businesses, stick to our knitting, stay in our swim lanes. These are high-growth businesses. We've built a great platform, ***and we can sustain the trajectory we have been on for the past three years for the next three***.

Now we're going to unveil our plan here today called sustaining profitable growth. As you come to know from us when we put a number on a piece of paper, it is a plan. ***It's not a hope, a dream or an aspiration. We put our name next to it, and then we drive that in hard, and every dollar of investment, every ounce of energy will be going into delivering on it***.

52. Zubretsky went on to state:

- 16 -

4925-9384-8205.v2

*The plan is empirical.  It's based on empirical data.  It's built from the bottoms up.  We're going to show you brick by brick, block by block, how this plan is built to deliver the results we say we're going to deliver over the next three years.  It's data driven and it's fact-based.*

\*          \*          \*

We will be able to grow premium over the next three years to 2027 at a rate of 11% to 13%, very equally balanced between our current footprint, strategic initiatives and M&A, we believe we'll be able to continue and sustain the 4% to 5% pre-tax margin range and grow earnings per share at 13% to 15%, with a little bit of juice from share repurchases on top of the topline growth.

53.     Keim also spoke directly to investors at Molina's November 8, 2024 Investor Day.  Keim praised Molina's medical management stating:

Look at the chart.  These are the stat MCRs right out of the stat filings.  How does Molina do it?  Well, Joe [Zubretsky] is fond of saying, we get the same rates as everybody else in a particular market.  There's four, five players in a market, we get the same rates.  Those corridors, we all have the same corridors.  We meet the member mix, no, it's pretty evenly spread.  Almost every market just about every MCO pretty much has the same acuity profile.

*So then what's the differentiator?  It's got to be medical management.*  How does that work?  Well, we do one thing, and we do it with a singular focus, medical management on folks, on government-funded plans.  This is what we call the wheel of medical management.  A number of things in there will look familiar but let me hit the highlights.  It starts with the medical economics platform.

It's so important to be able to look across 21 states and say, where are the hotspots?  Where are different conditions popping up?  Where are certain geographies popping up?  Where are certain demographics is popping up?  What specific providers by proper noun are popping up?

Once you see that, you can go address it, find out why put in the right actions, really important.  *Utilization management, this is a little cliché, but it's true.  Right treatment at the right time, right setting at the right cost.  That's the formula.*

### 3.     Molina's Fiscal Year 2024 Financial Results

54.     On February 5, 2025, Molina announced its financial results for FY24 in a press release and on Form 8-K filed with the SEC (the "FY24 Press Release").  The FY24 Press Release included a quote from Zubretsky, who stated: "*Our earnings growth profile is solid heading into 2025, and* . . . . *We remain confident in our ability to achieve our long-term financial targets*."

- 17 -

4925-9384-8205.v2

55.     The FY24 Press Release set 2025 premium revenue guidance as approximately $42 billion, an increase of approximately 9% from the full year 2024. . . . [and] *full year GAAP earnings per share . . . to be at least $22.50 per share* and . . . *full year adjusted earnings per share . . . to be at least $24.50 per share*.

56.     The FY24 Press Release provided full guidance for 2025, as follows:

| Full Year 2025 Guidance | |
|---|---|
| Premium Revenue | $42.0B |
| Total Revenue | $44.0B |
| *GAAP Net Income* | *$1,251M* |
| *Adjusted Net Income* | *$1,362M* |
| *GAAP EPS - Diluted* | *≥$22.50* |
| *Adjusted EPS - Diluted* | *≥$24.50* |
| Diluted weighted average shares | 55.6M |
| | |
| Year End Total Membership | 5.9M |
|   Medicaid | 5.0M |
|   Medicare | 250K |
|   Marketplace | 580K |
| *MCR* | *88.7%* |
| GAAP G&A Ratio | 7.2% |
| Adjusted G&A Ratio | 7.0% |
| Effective Tax Rate | 25.3% |
| GAAP After-tax Margin | 2.8% |
| Adjusted After-tax Margin | 3.1% |
| *See the Reconciliations of Unaudited Non-GAAP Financial Measures at the end of this release.* | |

**4.     Molina's 1Q25 Financial Results**

57.     On April 23, 2025, Molina announced its financial results for 1Q25 ended March 31, 2025 in a press release and on Form 8-K filed with the SEC (the "1Q25 Press Release").  The 1Q25 Press Release contained the following statement: "*The Company reaffirmed its full year 2025 earnings guidance with* expected premium revenue of approximately $42 billion and *adjusted earnings of at least $24.50 per diluted share*."

- 18 -

4925-9384-8205.v2

58. The 1Q25 Press Release also stated: "***The Company expects its full year GAAP earnings in 2025 to be at least $22.32 per share and reaffirms its full year adjusted earnings in 2025 to be at least $24.50 per share, representing 8% growth over the full year 2024***."

59. The following day, on April 24, 2025, Molina filed with the SEC its quarterly report on Form 10-Q (the "1Q25 10-Q"). The 1Q25 10-Q was signed by both Zubretsky and Keim, and stated that:

> The Medicaid MCR increased to 90.3% in the first quarter of 2025, from 89.7% in the first quarter of 2024, or 60 basis points, which was in line with our expectations. ***The increase was mainly attributable to the continued impact of higher utilization among our continuing population from the second half of 2024 that has continued into 2025***, including LTSS benefits, high-cost drugs, and behavioral health services and seasonal illnesses, partially offset by rate increases.

60. Also on April 24, 2025, Molina held a conference call with analysts and investors to discuss its 1Q25 financial results (the "1Q25 Earnings Call"). Zubretsky began the call stating:

> Today, I will discuss several topics. Our reported financial results for the first quarter. Our growth initiatives and the related increase to embedded earnings, and ***our full-year 2025 guidance, which we reaffirm*** at $42 billion of premium revenue and ***at least $24.50 in earnings per share***.

61. Keim later reaffirmed the EPS guidance stating: "***We reaffirm our full-year EPS guidance of at least $24.50 per share***."

62. Zubretsky went on to state:

> ***[O]ur 2025 guidance full-year 2025 premium revenue guidance remains unchanged at approximately $42 billion. We also reaffirm our full-year 2025 adjusted earnings per share guidance of at least $24.50 or 8% year-over-year growth***.

63. Zubretsky also told analysts and investors that: "***Our 2025 guidance is a strong foundation off of which to grow and to realize the embedded earnings power of the opportunities we have already secured***."

64. Zubretsky discussed Molina's products stating:

> In Medicare, we are pleased with the recent CMS final rate notice for Medicare Advantage. In addition, the early read on states promoting

- 19 -

4925-9384-8205.v2

the integration of Medicaid and Medicare bodes well for us having a significant Medicaid footprint and a competitive D-SNP offering.

Finally, *in marketplace, we remain confident in the stability of our membership and the outlook for the business*, despite the various program integrity initiatives and a final decision on the enhanced subsidies, which would impact marketplace enrollment in 2026.

65.     Zubretsky proclaimed that: "*Our 2025 earnings and growth profiles are solid and therefore we remain very confident in our ability to achieve our 13% to 15% long-term earnings per share growth target*."

66.     Keim went on to discuss the Company's management of its MCR, stating:

We expect higher organic growth in our marketplace and Medicaid segments to offset the mid-year loss of our Virginia contract. Recall, we previously guided for this contract to carry through year end, but now we expect our membership to be reallocated to other MCOs mid-year.  Our full-year consolidated MCR is now 88.8%.  *Within Medicaid, the full year MCR is unchanged at 89.9%*.

We are seeing rate increases slightly higher than we had previously expected as our state partners continue to update their actuarial data.  These rate increases are offset by our outlook on full-year trend, which is now slightly higher and reflects our conservatism at this point in the year.  Together, full-year rates and trends are both higher by 50 basis points and result in no change to the MCR guidance.

Our MCR guidance on Medicare also remains unchanged at 89%. We remain confident in the performance of our Medicare duals and integrated product business.  *In the marketplace, we are increasing our full-year MCR guidance from 79% to 80%, which is the upper end of our long-term target range*.

*This 100-basis point increase reflects the unfavorable non-recurring impacts in the quarter I discussed earlier.  The marketplace MCR trajectory for the rest of the year is largely unchanged from our prior view*.  We continue to expect the segment to produce mid single digit pre-tax margins.

67.     In the question and answer portion of the call, Zubretsky engaged in the following exchange with an analyst from Barclays:

[Question]: In the prepared remarks, you called out higher assumptions for both rates and cost trends.  Cost trend, it sounds like the rates is, on the Medicaid side sounds like the cost trend is on the ACA side.  Do I have that right?  And what exactly are you seeing on each of those items that is informing that updated assumption?  Thanks.

- 20 -

4925-9384-8205.v2

[Answer]: . . . We received rate updates in the first quarter $150 million, which equates to 50 basis points on a full year basis.

Those will nearly entirely impact Qs two, three and four and did not have an impact in Q1. So states are obviously recognizing certain cost pressures and updating rates both on-cycle and off-cycle to compensate for.

***The only reason we increased our trend estimate for the year is, at this early stage in the year, reflecting appropriate conservatism, we were not going to improve our Medicaid MCR by 50 basis points at this early stage***. So rather than those rate increases drop through to our guidance, we offset them with a topside adjustment, if you want to call it, to medical cost trend until we see more in the second quarter. ***So still holding serve on our 89.9% MCR estimate in Medicaid for the year, but the rates are moving in the right direction***.

68.    Keim affirmed Zubretsky's statements, confirming that "***on a full year basis, Medicaid guidance unchanged at 89.9%***."

### 5.    Molina's Preliminary 2Q25 Financial Results

69.    On July 7, 2025, Molina filed with the SEC a press release and Form 8-K with the SEC disclosing preliminary, unaudited financial results for 2Q25 (the "July 7 Press Release"). The July 7 Press Release stated: "***The Company's announcement of preliminary results was driven by recent market dynamics and off-cycle disclosures from others in the managed health care sector***." It included the following adjustments to the Company's guidance:

The Company now expects its second quarter 2025 adjusted earnings to be approximately $5.50 per share, which is modestly below its prior expectations. This preliminary result reflects medical cost pressures in all three lines of business. The Company expects these medical cost pressures to continue into the second half of the year. As a result, ***the Company now expects its full year 2025 adjusted earnings to be in the range of $21.50 to $22.50 per share***, reflecting a consolidated pre-tax margin of just under 4%, the low-end of its long-term guidance range.

70.    The July 7 Press Release also included the following statement from Zubretsky:

"The short-term earnings pressure we are experiencing results from what we believe to be a temporary dislocation between premium rates and medical cost trend which has recently accelerated." . . . "As we are still performing near our long-term target ranges, nothing, including the potential impacts of the budget bill, has changed our outlook for the long-term performance of the business."

- 21 -

4925-9384-8205.v2

**6.    Molina's 2Q25 Financial Results**

71.    On July 23, 2025, Molina announced its financial results for 2Q25 ended June 30, 2025 in a press release and on Form 8-K filed with the SEC (the "2Q25 Press Release").  The 2Q25 Press Release stated: "***The Company now expects its full year 2025 adjusted earnings to be no less than $19.00 per diluted share*** and reaffirms its premium revenue guidance of approximately $42 billion."

72.    The 2Q25 Press Release also discussed Molina's MCR, stating:

The Medicaid MCR for the second quarter of 2025 was 91.3%.  The Company experienced medical cost pressure due to continued utilization of behavioral health, pharmacy, and inpatient and outpatient services.  These medical costs were partially offset by the rate updates that went into effect in the first and second quarters.

73.    In the 2Q25 Press Release, Molina made further adjustments to guidance:

***The Company now expects its full year 2025 GAAP earnings to be no less than $16.90 per diluted share and its full year 2025 adjusted earnings to be no less than $19.00 per diluted share***.  The updated guidance, which is disproportionately attributed to Marketplace, reflects new information gained in the quarterly closing process and implications for medical cost trend assumptions for the second half of the year.

74.    And, in the 2Q25 Press Release, Molina announced its new full year 2025 guidance as:

| Full Year 2025 Guidance | |
|---|---|
| Premium Revenue | $42.0B |
| Total Revenue | $44.0B |
| *GAAP Net Income* | *$912M* |
| *Adjusted Net Income* | *$1,028M* |
| *GAAP EPS - Diluted* | *≥$16.90* |
| *Adjusted EPS - Diluted* | *≥$19.00* |
| Diluted weighted average shares | 54.1M |
| *MCR* | *90.2%* |
| *Medicaid* | *90.9%* |
| *Medicare* | *90.0%* |
| *Marketplace* | *85.1%* |
| GAAP G&A Ratio | 6.7% |
| Adjusted G&A Ratio | 6.6% |
| Effective Tax Rate | 25.3% |
| GAAP Pre-tax Margin | 2.8% |

- 22 -

4925-9384-8205.v2

| | |
|---|---|
| Adjusted Pre-tax Margin | 3.1% |

*See the Reconciliations of Unaudited Non-GAAP Financial Measures at the end of this release.*

75. The following day, on July 24, 2025, Molina filed with the SEC its quarterly report on Form 10-Q (the "2Q25 10-Q"). In the 2Q25 10-Q, Molina discussed its "[c]onsolidated medical care ratio ("MCR") of 90.4% compared with 88.6% for the second quarter of 2024, reflecting a very challenging medical cost trend environment for each of our segments, but *moderated by our effective medical cost management*."

76. Also on July 24, 2025, Defendants held a conference call with analysts and investors to discuss the Company's financial results (the "2Q25 Earnings Call"). On the 2Q25 Earnings Call, Zubretsky stated:

> Turning now toward 2025 guidance. Full year 2025 premium revenue guidance remains unchanged at approximately $42 billion. ***Our full year 2025 adjusted earnings per share guidance is now expected to be no less than $19 per share, a floor, if you will, which is $5.50 below our initial guidance of $24.50 and $3 lower than the midpoint of what was recently communicated on July 7.***

77. Regarding the Company's revised guidance, Zubretsky said:

> This revised guidance of a $19 floor produces a consolidated MCR and pretax margin of 90.2% and 3.1%, respectively. Our full year guidance now includes 140 basis points of consolidated MCR pressure compared to our initial guidance at $24.50, which is disproportionately attributed to marketplace. Marketplace is 10% of our revenue and accounts for nearly half of this 140 basis point MCR revision.
>
> ***We consider the $19 guidance to be a floor as we believe the cost trend could moderate from this conservative indication and produce earnings upside.***

78. Zubretsky discussed the assumptions underlying the guidance, including: "***In Medicaid, our guidance assumes a full year MCR of 90.9%.***"

79. Zubretsky also stated:

> In Medicare, our full year guidance includes an MCR of 90% and a low single-digit pretax margin. ***We continue to effectively manage the elevated utilization through our cost control protocols.***

80. Zubretsky turned the discussion to Marketplace and stated:

- 23 -

4925-9384-8205.v2

In Marketplace, at this time in the cycle, the focus is not only on the second half of 2025, but also on the positions taken in rate filings for 2026. ***With respect to full year 2025 we expect to produce an MCR of 85% and a pretax margin in the low single digits***. This result includes the pressure from the prior year items we recognized in the first half and the new store impact of ConnectiCare.

81.     Zubretsky summarized his remarks , telling analysts and investors that:

***with respect to our full year guidance, we provide it with full confidence, quantification and detail in this season of great uncertainty***. Turning now to our growth initiatives. ***We remain on track to achieving our premium revenue target of $46 billion in 2026*** . . . .

82.     Keim also addressed the Company's Medicaid costs on the 2Q25 Earnings call:

***In Medicaid, we are raising the full year MCR guidance from 89.9% to 90.9% as trend is now expected to exceed rates***. With the observed trend in Q2, and our expectations for higher trend over the rest of the year. ***We are updating our full year-over-year trend outlook from 5% to 6%***. The Updated rates in several states increased our full year-over-year rate only modestly from 5% to a little higher than 5%.

We have several known on-cycle rates time for Q3 and Q4. And recognizing higher experience trends. We continue to see a willingness from states to discuss off-cycle and retro rate adjustments as data develops, but we do not include speculative off-cycle rate updates in our guidance. In the second half of the year, ongoing medical cost pressure will exceed known rate updates.

***As such, we expect our Medicaid MCR of 90.8% in the first half to increase to 91% in the second half of the year***. Even at these MCR guidance levels higher than our long-term target range, our Medicaid segment full year pretax guidance margin is approximately 3.5%, demonstrating the underlying strength of this segment even in this challenging operating environment.

83.     Keim also discussed the MCR in the Company's Marketplace business:

***In marketplace, we are increasing our full year MCR guidance from 80 to 85***. The full year Marketplace MCR now includes approximately 200 basis points attributable to the combination of prior year member reconciliations and the new store impact of ConnectiCare.

Excluding these items, the normalized full year Marketplace MCR is approximately $83 million. ***We expect the normalized Marketplace MCR of $80 million in the first half of the year to increase to approximately $86 million in the second half of the year, reflecting higher observed trends and normal seasonal patterns for marketplace***.

84.     Keim stated that Molina's:

- 24 -

4925-9384-8205.v2

*[F]ull year EPS guidance is now expected to be no less than $19 per share lower than our first quarter guidance by $550 million.* Guidance now includes $8 for our updated full year MCR outlook, partially offset by $250 million from the improved G&A ratio and slightly higher investment income given the fewer Fed rate cuts now expected.

85.    During the 2Q25 Earnings Call, Keim participated in the following exchange with an analyst from *Barclays*:

[Question]: [Y]ou noted that the back half Medicaid MLR is higher than the first half, but it looks like there's some modest improvement from the 2Q MLR.  How do you get confidence that Medicaid margins will improve from here when the spot rate for reimbursement seems to be inadequate in an inflationary trend environment and newer redeterminations and integrity measures look like they may impact both membership and risk pool on a go-forward basis?  Thanks.

[Answer]: . . . *In the first half, we reported a 90.8% and my guidance implies a 91% for the second half of the year*.

### 7.    Molina's 3Q25 Financial Results

86.    On October 22, 2025, Molina announced its financial results for 3Q25 ended September 30, 2025 in a press release and on Form 8-K filed with the SEC (the "3Q25 Press Release").  In the 3Q25 Press Release, the Company quoted Zubretsky as saying that "'*approximately half of our underperformance is driven by the Marketplace business, and that Medicaid, while experiencing some pressure, is producing strong margins*.'"

87.    The 3Q25 Press Release re-affirmed the Company's revenue guidance for 2025 "to be approximately $42.5 billion," and adjusted its "*full year 2025 GAAP earnings to be approximately $11.90 per diluted share and its full year 2025 adjusted earnings to be approximately $14.00 per diluted share*."

88.    The following day, on October 23, 2025, Molina filed with the SEC its quarterly report on Form 10-Q (the "3Q25 10-Q") and Defendants held a conference call to discuss the Company's financial results (the "3Q25 Earnings Call").  On the 3Q25 Earnings Call, Zubretsky attempted to assuage the market as to the Company's revised guidance:

- 25 -

4925-9384-8205.v2

Our full-year premium revenue increases to approximately $42.5 billion. *Our full year 2025 adjusted earnings per share guidance is now expected to be approximately $14 per share*, which is $5 below our prior guidance of $19 per share. This revised guidance reflects a consolidated MCR of 91.3% and a pretax margin of 2.1%. *As we recount our original EPS guidance of $24.50 and a $10.50 revision to $14, we note that half of this revision emerges from the unprecedented utilization trend in Marketplace*, which represents nearly 10% of our business. Only one-third emerges from the rate and trend imbalance in Medicaid, which is 75% of our business and the remainder for Medicare.

Now some color on the segments related to our revised guidance. In Medicaid, our guidance assumes a full-year MCR of 91.5%, which produces a pretax margin of 3.2%. This Medicaid MCR result is above the high end of our long-term target range, but we evaluate it in the context of this challenging trend environment. Average rates achieved are now expected to be 5.5%, *but medical cost trend for the year is now expected to be 7%, which is 100 basis points higher than previous guidance*.

89. The statements by Defendants in ¶¶41-45, 47-69, 71, and 73-88, above were each false and/or materially misleading when made.

90. The truth that Defendants intentionally (or at the very least recklessly) concealed from investors was that Defendants did not have the ability to accurately manage Molina's medical care costs, and did not have sufficient visibility into members' medical expenses or demand for medical services to manage medical utilization rates, which compromised the accuracy and predictability of Molina's financial results.

91. The falsity and/or misleading nature of Defendants' Class Period representations to investors is demonstrated by the fact that it had to materially revise down its FY25 guidance multiple times (and by wide margins) before announcing its actual FY25 EPS number in February 2026 (as well as its projected FY26 EPS number), both of which were sizable downward revisions from what it told investors the prior quarter in October 2025.

(a)    For example, on February 5, 2025, Defendants announced that they projected Molina's FY25 adjusted earnings to be $24.50 per diluted share. They reaffirmed that guidance on April 23, 2025.

- 26 -

4925-9384-8205.v2

(b)      However, in a pre-announcement of its 2Q25 earnings, on July 7, 2025, Defendants revised Molina's FY25 guidance to a range of $21.50 to $22.50 – a 10.2% reduction and 10.3% below the Street's consensus.

(c)      Merely 16 days later, Defendants once again cut Molina's guidance on July 23, 2025, by a massive 13.6%, to FY25 adjusted earnings of no less than $19.00 a share.  This was 16.0% below the Street's consensus.

(d)      On October 22, 2025, Defendants announced that Molina's FY25 adjusted earnings were now on pace to be $14 per diluted share – a 26.3% reduction from what they guided on July 23rd.  Defendants also strongly indicated to investors that the $14 per diluted share was the floor for Molina's FY26 earnings.

(e)      And then finally, on February 5, 2026, Defendants announced that Molina's FY25 adjusted earnings per diluted share turned out to be $11.03 – a massive 21.2% reduction from their October 22nd projection.  In addition, Defendants also announced that the previously announced $14 EPS floor for FY26 was now going to be at least $5 per diluted share – a more than 64% miss.

92.    The falsity and/or misleading nature of Defendants' Class Period representations to investors is also evidenced by the fact that Molina's announced results for 4Q24, 2Q25, 3Q25, and 4Q25 were all vastly below analyst expectations.

(a)      For example, on February 5, 2025, Molina announced 4Q24 adjusted earnings per diluted share of $5.05, which missed Wall Street's consensus of $5.88 by 14%.

(b)      On July 7, 2025, Molina announced preliminary 2Q25 financial results and stated that it expected 2Q25 adjusted earnings to be approximately $5.50 per share.  This was an 11% miss of Wall Street's consensus of $6.20 for Molina's 2Q25 earnings.

(c)      On October 22, 2025, Molina announced 3Q25 adjusted earnings per diluted share of $1.84.  This was an incredible 53% below Wall Street's consensus of $3.92.

- 27 -

93. Finally, on February 5, 2026, Molina reported a 4Q25 adjusted loss per diluted share of $2.75, which was $3.16 below Wall Street's consensus expectations of positive $0.41.

## VI. The Truth Is Revealed

94. Molina's inability to accurately assess medical costs and utilization rates was revealed to the market in a series of consecutive guidance reductions and earnings misses throughout the second half of 2025 and into the first quarter of 2026.

95. The first of these guidance misses occurred when Molina issued its 2Q25 financial results after market closed on July 23, 2025. Molina announced at that time that it would be reducing its full year 2025 earnings guidance from prior guidance issued just *two weeks earlier* to $16.90 per share, and reducing its full year 2025 adjusted earnings guidance to $19.00 per share.

96. Analysts widely attributed this reduction to increased medicals costs. For example, analysts from J.P. Morgan wrote in a July 23, 2025 report that the new guidance was "driven by increased MCR . . . with all three lines of business seeing MCR step up." Likewise, analysts from TD Cowen noted utilization pressure and a higher-than-expected MLR were impacted Molina's Medicaid, Medicare, and Marketplace businesses, stating: "MDCD MLR saw continued pressure in BH utilization, Rx and IP+OP services. MDCR MLR saw pressure from higher LTSS and Rx utilization among high-acuity members" and noted that Markeplace MLR was "above internal expectations due to 'higher utilization relative to risk adjustment.'"

97. As a result, after the market opened on July 24, 2025, Molina's stock price fell by 16.8%.

98. After market close on October 22, 2025, Molina again was forced to adjust its guidance as a result of continuing utilization and MLR pressure. Along with its 3Q25 financial results, Molina issued further-reduced full year 2025 earnings guidance of $11.90 per share, and full year 2025 adjusted earnings guidance of $14.00 per share.

- 28 -

4925-9384-8205.v2

99. Analysts once again noted the impact of higher costs driving the reduction in guidance. Barclays analysts noted that Molina "raised full-year enterprise MLR guide by 110 bps" and noted a "460 bps increase in Individual ACA MLR . . . [a] 130 bps increase in Medicare MLR" and that the Medicaid MLR guide was up 140 bps in comparison with the first half of the year. Jefferies analysts also noted that the MLR for each of Molina's three lines of business was higher than both Jefferies' internal projections and market consensus.

100. As a result, after the market opened on October 23, 2025, Molina's stock price fell by 19.2%.

101. Then, on February 5, 2026, Defendants announced, for a ***third time***, that higher-than-expected medical costs were continuing to hamper the Company. After the market closed, Molina announced that its FY25 earnings fell well short of even the reduced guidance that it had issued the prior quarter, disclosing ***full year 2025 net income of just $8.92 per share, and full year 2025 adjusted net income of just $11.03 per share***. Defendants attributed these results to "continued high levels of utilization" in Medicaid, "higher utilization among high-acuity members" in Medicare, and "much higher levels of utilization relative to risk adjustment revenue" in Marketplace.

102. Molina also issued FY26 guidance that indicated continued high costs into the new year, projecting a 2% year-over-year decline in total revenue from 2025 to 2026. Full year 2026 earnings per share was projected to be at least $3.20, and full year 2026 adjusted earnings per share was projected to be at least $5 – a 55% adjusted earnings per share decrease from the Company's FY25 financial results.

103. Analysts were stunned by this news. Wells Fargo analysts noted the "[d]isappointing results" as a result of "cost pressures in Medicare/Exchanges" and commented that the "[g]uidance for 2026 EPS was established ***well below expectations and discussion with 3Q25***." Bernstein analysts were likewise surprised by the "magnitude" of the revision to 2026 guidance.

- 29 -

4925-9384-8205.v2

104. As a result, after the market opened on February 6, 2026, Molina's stock price collapsed by 29.5%.

## VII. Additional Allegations of Scienter

105. As alleged herein, Defendants acted with scienter in that they: (i) knew or recklessly disregarded that their publicly disseminated documents and statements were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants violated the securities laws alleged herein by virtue of their: (i) receipt of information reflecting the true facts regarding Molina's management, operations, and competitive landscape; (ii) control over, receipt of, and/or modification of Molina's allegedly materially misleading misstatements; and/or (iii) associations with the Company, which made them privy to confidential proprietary information concerning Molina.

106. Defendants defrauding of investors through false and/or misleading statements described in §V could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants. Given their executive-level positions with Molina, the Individual Defendants controlled the contents of Molina's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Due to their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein were concealed from the public and that the positive representations that were being made were false and misleading.

- 30 -

4925-9384-8205.v2

107.   Plaintiff also alleges that scienter of the Individual Defendants (who, as directors and/or executive officers of the Company, knew or recklessly ignored facts related to the core operations of Molina) can be imputed to Molina.

### A.   Defendants' False and/or Misleading Statements Concerned Molina's Core Operations

108.   During the Class Period, Molina was a "pure-play government-sponsored healthcare business."  As Molina's CEO, Zubretsky proudly told analysts on a February 8, 2024 conference call announcing the Company's 4Q23 earnings, that Molina does one thing: "We are in the business of providing assets to high-quality healthcare for individuals relying on government assistance."  In other words, Molina's entire business, and thus its financial success or failure, rises or falls based on the money it makes providing health insurance to individuals relying on Medicaid, Medicare, and/or the Marketplace.  For example, Molina's Medicaid plans, the Company's "flagship" product, represented nearly 80% of the Molina's revenue in 2024 (with plans for Medicare hovering around 14% and those for the Marketplace around 7%).  And because these three lines of business ***represented virtually 100%*** of the Company's healthcare insurance product offerings, it was their dismal financial performance (which Defendants concealed from investors during the beginning of the Class Period through their material misstatements) that drove the massive EPS guidance revisions Defendants publicly announced in July 2025, October 2025, and February 2026.  *See* ¶¶94-104.

### B.   The Individual Defendants Publicly Held Themselves Out to Investors as Knowledgeable About the Core Operations of the Company that Involved the Fraud

109.   Throughout the Class Period, Molina's CEO and CFO, *i.e.*, the Individual Defendants, were unquestionably the collective face of the Company, holding themselves out to analysts and investors as top executives who knew the ins and outs of their Company – a company they ran "in a very hands-on way."  As Keim told the

4925-9384-8205.v2

audience during a November 8, 2024 Investors day: "It's very personal to us." As for Zubretsky, the Molina CEO proclaimed to investors that same day that:

> We do have a Molina Playbook. We have a way of doing things inside the company, operating model, management process, work design and talent that I'm not sure it's headline news anywhere, but it's disciplined, it's rigorous, it's religious. We have a playbook.

110. In a call with analysts and investors on October 23, 2025 to discuss the Company's 3Q25 earnings, in response to a question about Medicaid and Marketplace rates, Zubretsky responded: "***Mark [Keim] and I spent a lot of time managing what we call the portfolio***[,] and we do not tolerate performance SKUs, everybody's got to deliver." Later in that same call, Molina's CEO, in response to a question about Medicaid margins and state rate increases, stated: "On the Medicaid rates, . . . Mark [Keim] and I, particularly Mark spent a lot of time in this process."

111. On calls with analysts and investors in the time both leading up to and during the Class Period, Zubresky and Keim openly talked (and answered analysts questions) about the "building blocks" for Molina's earnings guidance, the fact that the Company had "very detailed models," the tracking and modeling of shifts and trends related to acuity and utilization among its insured population, and how the Company's "plan is empirical . . . based on empirical data" and allegedly "built from the bottoms up."

**C.    Defendant Zubretsky's Suspiciously-Timed Insider Stock Sales for More than $28 Million in Proceeds Support a Motive to Commit Fraud**

112. On April 30, 2025 (and during 2Q25 – the same quarter as the first partial disclosure of Defendants' misrepresentations), Zubretsky sold 87,500 shares of his personally held Molina stock (or nearly 23% of his holdings at the time) at prices as high as $324.70 per share – nearly 2.5 times Molina's stock price at the close of the Class Period on February 6, 2026 – for just over $28 million in total proceeds. Given that Zubretsky had not sold any shares in 2024 or 2023, and only sold stock in 2022 pursuant to a 10b5-1 plan, his 2Q25 trading – timed before the Company announced,

- 32 -

4925-9384-8205.v2

just over two months later during 2Q25, its first of several massive EPS guidance cuts – was highly suspicious.

**D.   The Individual Defendants' SOX Certifications and Signing of SEC Filings Supports Scienter**

113.   Zubretsky and Keim signed SOX certifications during the Class Period, undertaking the affirmative obligation to ensure the Company's disclosures to the market were not materially false or misleading and so represented that they had evaluated the effectiveness of Molina's disclosure controls.

114.   SOX was created in the wake of a series of high-profile corporate frauds and resultant market turmoil, and contains a series of reforms designed to enhance corporate responsibility, promote accurate and reliable financial disclosures, and combat accounting and securities fraud.  Arguably, one of the most important reforms instituted under SOX was SOX §302, Exchange Act Rule 13a-14, which provides that each financial report filed on SEC Forms 10-Q and 10-K must include a certification signed by the issuer's CEO and CFO.

115.   Zubretsky and Keim signed SOX certifications filed with Molina's 3Q24 10-Q representing that:

(a)   "I have reviewed this Quarterly Report on Form 10-Q for the period ended September 20, 2024 of Molina Healthcare, Inc.";

(b)   "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report";

(c)   "Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report";

(d)    "The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have":

(i)    "Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared";

(ii)    "Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles";

(iii)    "Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation"; and

(iv)    "Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting"; and

(e)    "The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions)":

- 34 -

4925-9384-8205.v2

(i)      "All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information"; and

(ii)      "Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

116.    Zubretsky and Keim also signed SOX certifications filed with the financial report for FY24, filed with the SEC on Form 10-K on February 11, 2025, stating that:

(a)      "In connection with the Annual Report of Molina Healthcare, Inc. (the "Company") on Form 10-K for the period ended December 31, 2024 (the "Report"), I, [signatory], certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that":

(i)      "The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended"; and

(ii)      "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

## E.    Corporate Scienter

117.    The allegations above also establish a strong inference that Molina acted with corporate scienter throughout the Class Period as Defendants and Molina officers, management, and agents had actual knowledge of the misrepresentations of material facts set forth herein or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were known or available to them.  Such material misrepresentations were made knowingly or recklessly, and without a reasonable basis.  By concealing these material facts from

- 35 -

4925-9384-8205.v2

investors, Molina maintained and/or increased its artificially inflated securities prices throughout the Class Period.

## VIII.  Loss Causation/Economic Loss

118.    During the Class Period, as detailed herein, Defendants' materially false and/or misleading statements artificially inflated the price of Molina's stock.  Their conduct operated as a fraud or deceit on members of the Class, including through statements which failed to disclose and misrepresented the adverse facts relating the Company's ability to predict and manage medical utilization and costs.

119.    Defendants' false and/or misleading statements and omissions identified herein at ¶¶41-45, 47-69, 71, and 73-88, had the intended effect and caused Molina stock to trade at artificially inflated levels during the Class Period.

120.    The price of Molina stock dropped significantly, as the artificial inflation dissipated each time the Defendants' prior false statements and misrepresentations were at least partially disclosed or became apparent to the market, and/or the risks concealed by their misconduct at least partially materialized.

121.    The market for Molina common stock was open, well-developed, and efficient at all relevant times.  Throughout the Class Period, Molina common stock traded at artificially inflated prices as a direct result of Defendants' materially false and/or misleading statements of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public.  Plaintiff and other Class members purchased or otherwise acquired Molina common stock relying upon the integrity of the market price for Molina common stock and market information relating to Molina.

122.    Defendants' misrepresentations and fraudulent conduct became apparent to the market through three separate partially corrective disclosures.  In each instance, the price of Molina's common stock immediately declined as the artificial inflation was removed from the market price of the securities, causing substantial damage to Plaintiff and the Class.

- 36 -

4925-9384-8205.v2

123. After the market closed on July 23, 2025, Molina released its 2Q25 financial results, including adjusted earnings per diluted share of $5.48, and reported that the "Company experienced medical cost pressure due to continued utilization of behavioral health, pharmacy, and inpatient and outpatient services." The Company also further reduced its full year 2025 guidance, which had been revised down only two weeks earlier on July 7, 2025 – stating that the updated guidance "reflects new information gained in the quarterly closing process and implications for medical cost trend assumptions for the second half of the year."

124. Defendants immediately worked to assuage investors' concerns. On July 24, 2025, the Company held an earnings conference call with analysts and investors. On the call, Zubretsky noted that the downward revision in full year 2025 guidance was due to "new information gained in our June close process" which the Company purportedly used as the "most recent experience data" to forecast the rest of the year.

125. Investment analysts were both surprised and concerned about the Company's financial condition and the additional guidance cut. For example, in a July 24, 2025 report, a Barclays analyst said "MOH's stock is down 15% (vs. S&P +0.3%) as of 3pm ET, driven by an incremental 14% guidance cut primarily on ACA trend pressure as well as incremental Medicaid and Medicare headwinds."

126. On the same day, Bank of America published a report stating that "[t]he 'what' of trend understood, but not the 'why'", and that "it is still not clear to mgmt (or us) why trend has risen so stubbornly, lowering visibility in the improvement MOH expects."

127. In response to this news, on July 24, 2025 Molina's common stock closed down $32.30, or 16.8%, in just a single day, on abnormally high volume of over 5.49 million shares traded. By contrast, on the same date, the S&P 500 Index was flat and an index of Molina's peers declined by just 2.3%.

128. Despite these disclosures, the price of Molina common stock remained artificially inflated because Defendants continued to make materially false or

- 37 -

misleading statements undermining the depth of the Company's financial problems, and assured investors that the EPS guidance going forward would not decline further.

129.   On July 24, 2025, for example, analysts at Guggenheim reported that "[n]onetheless, amid this evolving backdrop, mgmt was confident that the new \$19 2025 EPS outlook is a floor, with possible cost trend moderation providing potential upside in 2H25."

130.   After the market closed on October 22, 2025, Defendants again shocked investors when the Company reported devastating financial results for its 3Q25, and again lowered its full-year 2025 guidance.  The Company reported "GAAP net income for the third quarter of 2025 was \$1.51 per diluted share, a decrease of 73% year over year," while "[a]djusted net income for the third quarter of 2025 was \$1.84 per diluted share, a decrease of 69% year over year."  The Company disclosed that "Medicaid contributed a gain to adjusted earnings of \$3.52 per diluted share but was offset by a loss of \$1.68 per diluted share due to performance in Medicare and Marketplace."  The Company also disclosed that it "now expects its full year 2025 GAAP earnings to be approximately \$11.90 per diluted share and its full year 2025 adjusted earnings to be approximately \$14.00 per diluted share," down from \$19.00 per diluted share guidance from the previous quarter.  Molina attributed the lower guidance to "higher medical cost trend in all segments and, disproportionately, by the unprecedented medical cost trend in Marketplace, which is expected to continue through the end of the year."

131.   In response to this news, on October 23, 2025, Molina's common stock closed down \$34.13, or 19.2%, in a single day, on abnormally high volume of over 7.85 million shares traded.  By contrast, on the same date, the S&P 500 Index increased 0.6% and an index of Molina's peers declined by just 0.5%.  Despite these disclosures, the price of Molina common stock remained artificially inflated because Defendants continued to make materially false or misleading statements.

4925-9384-8205.v2

132.    October 22, 2025, Morgan Stanley reported "[m]ore importantly, it unveiled a preliminary outlook for 2026, which calls for EPS in line with 2025 of~$14.00, well short of Street expectations of $19.33 (+3.6%)."  On October 23, 2026, Barclays reported "MOH's stock is down 20% (vs. S&P +0.2%) likely driven by worse-than-expected negative guidance revision on incremental pressure across all three business lines."  On October 24, 2025, Deutsche Bank analysts wrote:

> MOH reported disappointing Q3 results and guided down FY25 EPS again.  Full year adjusted EPS is now expected to be approximately $14, $5 below prior reduced guidance of $19.  From the initial guidance of $24.50 to $14.00 today, MOH sees about half of the revision *attributed to utilization trend in Marketplace* and about one-third by rate and trend misalignment in Medicaid.

133.    After the market closed on February 5, 2026, Molina shocked investors when it announced devastating financial results for 4Q25 and year-end 2025, including a massive earnings miss and bleak financial outlook for the coming year. The Company reported a $160 million loss in the fourth quarter, compared to a $251 million in profit for 4Q24.  For the full year, Molina reported $472 million in profit, down from $1.2 billion in 2024.  Defendants also slashed 2026 guidance to a minimum of $5.00 per share, a 55% decline from 2025.

134.    Financial analysts were shocked by this news.  On February 5, 2026, Deutsche Bank analysts published a report titled "Get Us a MOH-ito: Sharp 2026 Guide Down," which said, "What's the Polar Opposite of a Beat and Raise?: MOH released its Q4 and FY25 results ahead of its earnings call tomorrow morning, and the biggest surprise is the drastic pullback in F2026 guidance."

135.    A February 5, 2026, JPMorgan report entitled "4Q25 Miss and 2026 Guide Meaningfully Below Previous Commentary Creates Challenging Near-Term Set Up," reported that "[a]fter the close, MOH posted a significant miss on 4Q earnings and introduced 2026 guidance that was ~64% below consensus . . . The above-expectations Marketplace MCR was partially attributed to much higher levels of utilization relative to risk adjustment revenue."

- 39 -

4925-9384-8205.v2

136.   In a February 6, 2026, report entitled "Total Reset; 4Q & 2026 Guide Disappoint," Morgan Stanley analysts wrote that "[t]he miss was driven primarily by continued elevated utilization," and that "the outlook shortfall is notable, ***driving its shares down 34% after hours***" (emphasis in original).

137.   In response to this news, on February 6, 2026, Molina's common stock closed down $45.12, or 29.5%, in a single day, on abnormally high volume of over 10.34 million shares traded.  By contrast, on the same date, the S&P 500 Index increased 1.9% and an index of Molina's peers increased by 0.1%.

138.   Each of the three partially corrective disclosures listed above served to remove the artificial inflation from the price of Molina's common stock, and were direct and foreseeable consequences of the disclosure of the relevant truth concealed by Defendants.

## IX.    Class Action Allegations

139.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Molina stock during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein and their immediate families, legal representatives, heirs, successors, and assigns; the officers and directors of the Company, at all relevant times, and members of their immediate families, legal representatives, heirs, successors, and assigns; and any entity in which Defendants have or had a controlling interest.

140.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Molina's stock was actively traded on the NYSE in an efficient market.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified

- 40 -

4925-9384-8205.v2

from records maintained by Molina or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

141. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

142. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

143. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Molina, Zubretksy, and Keim to the investing public during the Class Period misrepresented material facts about the business, operations and management of Molina;

- whether Zubretsky and Keim caused Molina to issue false and/or misleading financial statements during the Class Period;

- whether Molina, Zubretsky, and Keim acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the price of Molina stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

144. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is

- 41 -

4925-9384-8205.v2

impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.   Applicability of the Presumption of Reliance

145.   Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the misrepresentations were material;

- Molina's stock traded in an efficient market, was liquid and traded with moderate to heavy volume during the Class Period;

- the Company's stock was traded on the NYSE and was covered by multiple analysts;

- the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

- Plaintiff and members of the Class purchased, acquired and/or sold Molina stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

146.   Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## XI.   Claims for Relief

### COUNT I
### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

147.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  Count I is brought pursuant to §10(b) of the Exchange Act (15 U.S.C. §78j(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

- 42 -

148. During the Class Period, Defendants made various false and/or misleading statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

149. By virtue of their ownership and/or positions at Molina, Defendants had actual knowledge of the materially false and misleading statements alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts were committed willfully or with reckless disregard for the truth.

150. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As senior managers and/or directors of Molina, the Individual Defendants had knowledge of the details of Molina's internal affairs.

151. Molina is liable for all false and/or misleading statements made during the Class Period, as alleged above, including the false and misleading statements made by the Company's officers and agents, as alleged above, as the maker of such statements and under the principle of *respondent superior*.

152. The Defendants are directly and indirectly liable for the wrongs complained of herein. Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the statements of Molina. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Molina's businesses, operations, future financial condition, and future prospects. As a result of Defendants' misconduct, the market price of Molina's common stock was artificially inflated throughout the Class Period. Unaware of the

- 43 -

4925-9384-8205.v2

adverse facts concerning Molina's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Molina common stock at artificially inflated prices and in doing so relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

153. During the Class Period, Molina common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Molina common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said Molina common stock, or would not have purchased or otherwise acquired it at the inflated prices paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Molina common stock was substantially lower than the prices paid by members of the Class. The market price of Molina common stock declined upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

154. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

155. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and/or sales of Molina common stock during the Class Period, as the truth about Molina's operations and prospects began to be disclosed to the investing public.

- 44 -

4925-9384-8205.v2

**COUNT II**
**For Violation of §20(a) of the Exchange Act**
**Against All Defendants**

156.   Plaintiff repeats and realleges each and every allegation set forth in 1-155 above.

157.   During the Class Period, Defendants participated in and oversaw the operation and management of Molina, and conducted and participated, directly and indirectly, in the conduct of Molina's business affairs.

158.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Molina's financial condition and results of operations, and to correct promptly any public statements issued by Molina which had become materially false or misleading.

159.   Each of the Defendants, therefore, acted as a controlling person of Molina.  By reason of their senior management positions and/or being directors, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Molina to engage in the unlawful acts and conduct complained of herein.  Each of the Defendants exercised control over Molina's operations and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.  Throughout the Class Period, Defendants exercised their power and authority to cause Molina to engage in the wrongful acts complained of herein.  Defendants, therefore, were "controlling persons" of Molina within the meaning of §20(a) of the Exchange Act.

160.   Molina had the power to control and influence the Individual Defendants, and other Company executives through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations.  By virtue of the foregoing, Molina had the power to influence and control, and did influence and control, directly

- 45 -

4925-9384-8205.v2

or indirectly, the decision-making of the Individual Defendants, including the content of their public statements.

161. By reason of the above conduct, Defendants are liable pursuant to §20(a) of the Exchange Act for the violations committed by Molina.

## XII.   Prayer for Relief

WHEREFORE, Plaintiff respectfully prays for relief and judgment, as follows:

A.   Determining that this action is a proper class action and certifying Plaintiff as Class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as Class counsel;

B.   Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the federal securities laws, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Such equitable, injunctive, or other and further relief as the Court may deem just and proper, including, but not limited to, rescission.

## XIII.  Demand for Jury Trial

Plaintiff hereby demands a trial by jury.

DATED: March 31, 2026

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ
LUCAS F. OLTS
MATTHEW I. ALPERT
JACK ABBEY GEPHART
JACK K. SCOTT

s/ Matthew I. Alpert
MATTHEW I. ALPERT

- 46 -

4925-9384-8205.v2

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
lolts@rgrdlaw.com
malpert@rgrdlaw.com
jgephart@rgrdlaw.com
jscott@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 47 -

4925-9384-8205.v2