**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JEFFREY HINDELMANN, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

MOLINA HEALTHCARE, INC.; JOSEPH M. ZUBRETSKY; and MARK L. KEIM,

Defendants.

Case No. 2:25-cv-09461-SPG-RAO

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS [ECF NOS. 55, 55-1]**

Before the Court is the Motion to Dismiss Consolidated Complaint, (ECF No. 55-1 ("Motion")), filed by Defendants Molina Healthcare, Inc. ("Molina" or the "Company"); Joseph M. Zubretsky ("Zubretsky"); and Mark L. Keim ("Keim" and, together with Molina and Zubretsky, "Defendants"). The Court has read and considered the Motion and determined that the Motion is suitable for decision without oral argument. *See* Fed. R. Civ. P. 78(b); *see also* C.D. Cal. L.R. 7-15. Having considered the parties' submissions, the record in this case, and the relevant law, the Court GRANTS the Motion.

# I. FACTUAL BACKGROUND

According to Lead Plaintiff Automotive Industries Pension Trust Fund's ("Plaintiff") Consolidated Complaint, between October 23, 2024, and October 23, 2025, Defendants made 45 false or materially misleading statements (the "Challenged Statements") concerning the Company's earnings guidance and operations. *See* (ECF No. 50 ("Complaint") ¶¶ 41–45, 47–69, 71, 73, 74–88). Plaintiff alleges that the Challenged Statements were false or materially misleading because Defendants' "models and data could not sufficiently forecast" medical cost trends and, as a result, the Company's financial projections "were not grounded in reliable data or reasonable assumptions." (*Id.* ¶ 3).

## A. The Company

Molina is a health insurance provider that administers nationwide public and private health insurance plans. *See* (*id.* ¶ 18). Zubretsky is the Company's Chief Executive Officer, as well as the President of the Company's Board of Directors. *See* (*id.* ¶ 19). Keim is the Company's Chief Financial Officer. *See* (*id.* ¶ 20).

The Company reports revenue from three business segments: Medicaid; Medicare; and Marketplace. *See* (*id.* ¶ 27). In 2024 and 2025, the Company primarily earned insurance premium revenue through its Medicaid segment. *See* (*id.* ¶ 29). Medicaid is a government program, jointly funded by the federal government and state governments, that provides healthcare and long-term care services to low-income Americans. *See* (*id.* ¶ 28). Most states contract with managed care plans, such as those offered by the Company, to provide Medicaid services to residents. *See* (*id.*). During the same period, the Company's Medicare business segment was its second largest reported source of revenue. *See* (*id.* ¶ 31). Medicare is a federal program that provides medical benefits to eligible people who are 65 or over, as well as some people with disabilities. *See* (*id.* ¶ 30). Finally, during this period, the Company's Marketplace business segment was its smallest reported source of revenue. *See* (*id.* ¶ 33). Through its Marketplace segment, the Company offers health

insurance plans on marketplace insurance exchanges created by the Affordable Care Act. *See* (*id.* ¶ 32).

In each of its reported business segments, the Company relies on its ability to evaluate and project medical costs. *See* (*id.* ¶ 24). The Company uses three metrics to evaluate and project costs. *See* (*id.*). First, a segment's medical utilization rate tracks members' interactions with the healthcare system. *See* (*id.* ¶ 25). Higher utilization of medical services leads to increased total medical costs which, in turn, increases the Company's payment of claims per member and reduces the Company's margins. *See* (*id.*). Second, the medical cost ratio ("MCR") tracks the proportion of premium revenues spent on medical claims and healthcare services. *See* (*id.* ¶ 26). Finally, the medical loss ratio ("MLR") tracks the proportion of premium revenues spent on medical services and quality improvements. *See* (*id.*). The federal and state governments set mandatory floors on insurers' MLR rates for Medicaid, Medicare, and Marketplace services, in order to ensure that a minimum percentage of premium revenues are spent on medical care, instead of going to administrative costs or profits. *See* (*id.*).

According to the Complaint, the Company's ability to control medical costs and manage utilization rates is material to investors. *See* (*id.* ¶¶ 34–40). From October 23, 2024, through February 6, 2026 (the "Class Period"), financial analysts regularly published reports focused on the Company's MLRs in its Medicaid, Medicare, and Marketplace segments. *See* (*id.* ¶ 39). For example, on November 10, 2024, Wells Fargo wrote that it was "impressed" by the Company's "execution to drive best-in-class Medicaid MLRs." (*Id.* ¶ 39(a)). On April 23, 2025, Cantor Fitzgerald wrote that it expected the Company to outperform its peers based, in part, on the Company's year-over-year increase in its Marketplace MLR and better-than-expected performance in its Medicaid MLR. *See* (*id.* ¶ 39(b)). On April 24, 2025, TD Cowen increased its target price for the Company's stock based, in part, on the Company's projected MLRs. *See* (*id.* ¶ 39(c)). On August 15, 2025, Wells Fargo wrote that it expected the Company's stock price to outperform its peers based, in part, on the Company's MLRs in its Medicaid segment. *See* (*id.* ¶ 39(d)).

**B. The Challenged Statements**

Plaintiff challenges as false or materially misleading Defendants' statements on the Company's quarterly earnings calls, in the Company's quarterly Securities and Exchange Commission ("SEC") filings, and during an Investor Day presentation. *See* (*id.* ¶¶ 41–88). Defendants made the first Challenged Statement in the Company's earnings press release for the third quarter of fiscal year 2024, *see* (*id.* ¶ 41), and the last Challenged Statement in the Company's earnings call for the third quarter of fiscal year 2025, *see* (*id.* ¶ 88).

1. <u>3Q24 Financial Results</u>

In the Company's third quarter 2024 press release, on October 23, 2024, the Company "reaffirmed its full year 2024 guidance" of approximately $38 billion in premium revenue, as well as its guidance for "adjusted earnings of at least $23.50 per diluted share." *See* (*id.* ¶¶ 41–42, 43). The Company wrote that its "continued strong performance" was due to its Marketplace segment, operating leverage, and higher net investment income, and the Company expected these factors to "offset the higher-than-expected trend in Medicaid and Medicare" for the second half of 2024. *See* (*id.* ¶ 42). In the Company's earnings call for the quarter, on October 24, 2024, Keim said that the Company expected a "full-year Medicaid MCR of approximately 90%," which reflected an increase from the Company's prior guidance due to "retroactive premium adjustments in California." *See* (*id.* ¶ 43). In response to an analyst question concerning whether there were opportunities for the company to "push back" on "utilization trends" in the Company's Medicaid and Medicare segments, Zubretsky said that these trends were "all relative" because companies "all get the same rates" but the Company had "proven on a sustainable basis that we are managing medical costs effectively." (*Id.* ¶ 44). In response to another question concerning medical cost trends, Zubretsky described the interplay of rates, cost trends, and risk corridors, saying that "the model is working exactly as we have predicted. The corridors act as a financial buffer, giving rates time to catch up with trend." (*Id.* ¶ 45).

2. November 2024 Investor Day

On November 8, 2024, the Company spoke to investors at the Molina Healthcare Investor Day. *See* (*id.* ¶ 46). The Company's Investor Day Presentation highlighted the Company's "[s]tate-of-the-art medical economics platform," "[u]tilization management," and "[h]igh-acuity care management" as "capabilities" to "drive medical cost efficiencies." (*Id.* ¶ 47). The presentation also stated that "Molina's sustainable, best in class margins" in its Medicaid segment were "driven by continually outperforming total state populations." (*Id.* ¶ 48). The presentation also stated that the Company's "Medicaid risk corridor positions are a result of margin outperformance" and help to "mitigate potential inflections in medical cost trends." (*Id.* ¶ 49). The presentation then addressed the Company's historical "risk corridor protection" stating, for example, that, "[i]n 2024, risk corridors absorbed higher medical costs due to redetermination acuity shifts." (*Id.*). The presentation also stated that the Company has "a clear formula to deliver organic premium growth and sustainable MCR to achieve pre-tax margins." (*Id.* ¶ 50).

During the Company's Investor Day presentation, Zubretsky said that the Company was "in the right businesses," its business segments were "high-growth businesses," and the Company could "sustain the trajectory we have been on for the past three years for the next three." (*Id.* ¶ 51). He also said that the Company's "plan" for "sustaining profitable growth" was "a plan," "not a hope, a dream or an aspiration." (*Id.*). Addressing the Company's plan, Zubretsky said, "[w]e put our name next to it, and then we drive that in hard, and every dollar of investment, every ounce of energy will be going into delivering on it." (*Id.*). Zubretsky also said that the Company's plan is "empirical" and is "based on empirical data." (*Id.* ¶ 52). Keim told investors that the Company had "the same rates as everybody else" in a particular participant market and, as a result, the Company's "medical management" was "the differentiator" between the Company and its competitors. *See* (*id.* ¶ 53). Keim also told investors that the Company's "formula" depended on "[u]tilization management," supplying the "[r]ight treatment at the right time" and the "right setting at the right cost." (*Id.*).

3. FY24 Financial Results

On February 5, 2025, the Company announced its financial results for fiscal year 2024. *See* (*id.* ¶ 54). The Company's earnings press release quoted Zubretsky as saying, "[o]ur earnings growth profile is solid heading into 2025" and "[w]e remain confident in our ability to achieve our long-term financial targets." (*Id.*). The press release also announced earnings guidance of approximately $42 billion in revenue, full year earnings per share of at least $22.50 according to Generally Accepted Accounting Principles ("GAAP"), and full year adjusted earnings per share of at least $24.50. *See* (*id.* ¶ 55). The press release further guided to $1.251 million in GAAP net income, $1.362 million in adjusted net income, and a MCR of 88.7%. *See* (*id.* ¶ 56).

4. 1Q25 Financial Results

On April 23, 2025, the Company announced its financial results for the first quarter of 2025. *See* (*id.* ¶ 57). In its earnings press release for the quarter, "[t]he Company reaffirmed its full year 2025 earnings guidance with expected premium revenue of approximately $42 billion and adjusted earnings of at least $24.50 per diluted share." (*Id.*). The Company also announced that it "expect[ed] its full year GAAP earnings in 2025 to be at least $22.32 per share." (*Id.* ¶ 58). In its quarterly SEC filing, the Company reported that its "Medicaid MCR increased to 90.3% in the first quarter of 2025," which was "mainly attributable to the continued impact of higher utilization among our continuing population from the second half of 2024 that has continued into 2025." (*Id.* ¶ 59).

During the Company's earnings call for the quarter, Zubretsky reaffirmed the Company's 2025 revenue guidance, and both Zubretsky and Keim reaffirmed the Company's earnings per share guidance. *See* (*id* ¶¶ 60–62). Zubretsky also told investors that the Company's 2025 guidance was "a strong foundation off of which to grow and to realize the embedded earnings power of the opportunities we have already secured." (*Id.* ¶ 63). He said that the Company "remain[ed] confident" in the stability of its membership in the Company's Marketplace segment, as well as "the outlook for the business." (*Id.* ¶ 64). Zubretsky also said that the Company's "2025 earnings and growth profiles are

solid," and he was therefore "very confident" in the Company's ability to achieve its "13% to 15% long-term earnings per share growth target." (*Id.* ¶ 65).

Keim told investors that, within the Company's Medicaid segment, its expected "full year MCR is unchanged at 89.9%." (*Id.* ¶ 66). He also said that the Company was increasing its full-year MCR guidance in its Marketplace segment from 79% to 80%, which is the "upper end" of the Company's "long-term target range." (*Id.*). Keim referenced a "100-basis point increase" from "unfavorable non-recurring impacts in the quarter" but said that the Marketplace segment's "MCR trajectory for the rest of the year is largely unchanged" from the Company's prior guidance. *See* (*id.*).

During the question-and-answer portion of the Company's earnings call, an analyst from Barclays asked Zubretsky about the Company's "higher assumptions for both rates and cost trends." (*Id.* ¶ 67). In response, Zubretsky said that states were "recognizing certain cost pressures" and updating rates to compensate for those cost pressures. *See* (*id.*). Zubretsky further said that, "[t]he only reason we increased our trend estimate for the year is, at this early stage in the year, reflecting appropriate conservatism, we [are] not going to improve our Medicaid MCR by 50 basis points at this early stage." (*Id.*). Zubretsky said that the rate increases would be offset by the Company's medical cost trends, and so the Company would hold its "89.9% MCR estimate in Medicaid for the year." (*Id.*). Similarly, Keim confirmed that the Company's full-year guidance for its Medicaid MCR was "unchanged at 89.9%." *See* (*id.* ¶ 68).

5. <u>Preliminary 2Q25 Financial Results</u>

On July 7, 2025, the Company announced "preliminary, unaudited" financial results for the second quarter of 2025. *See* (*id.* ¶ 69). In a press release, the Company explained that the Company's decision to announce "preliminary results," ahead of the Company's scheduled second quarter earnings release, was "driven by recent market dynamics and off-cycle disclosures from others in the managed health care sector." (*Id.*).

In the press release, the Company announced that it was reducing its "full year 2025 adjusted earnings to be in the range of $21.50 to $22.50 per share." (*Id.*). The Company

attributed its change in guidance to "medical cost pressures in all three lines of business" and said that the Company expected "these medical cost pressures to continue into the second half of the year." (*Id.*). The press release also quoted Zubretsky, who said that the Company was seeing "short-term earnings pressure" from what it "believe[d] to be a temporary dislocation between premium rates and [the] medical cost trend," which had "recently accelerated." (*Id.* ¶ 70).

6. Final 2Q25 Financial Results

Approximately two weeks later, on July 23, 2025, the Company announced its finalized financial results for the second quarter of 2025. *See* (*id.* ¶ 71). In its earnings press release, the Company reaffirmed its revenue guidance for 2025 but reduced its net income guidance to $912 million using GAAP earnings or $1.028 million using adjusted earnings. *See* (*id.* ¶¶ 71, 74). The Company also reduced its guidance for earnings per share to "no less" than $16.90 using GAAP earnings and $19 per share using adjusted earnings. (*Id.* ¶¶ 71, 73). The Company said that its updated guidance was "disproportionately attributed" to its Marketplace segment, explaining that it had updated its guidance based on "new information gained in the quarterly closing process and implications for medical cost trend assumptions for the second half of the year." (*Id.* ¶ 73). In the Company's quarterly SEC filing, on July 24, 2025, the Company disclosed a 90.4% MCR, as compared to an 88.6% MCR for the second quarter of 2024. *See* (*id.* ¶ 75). The Company attributed the increase in its MCR to "a very challenging medical cost trend environment" in each business segment but wrote that the medical cost trend was "moderated" by the Company's "effective medical cost management." (*Id.*).

During the Company's quarterly earnings call, on July 24, 2025, Zubretsky reaffirmed the Company's full year revenue guidance, saying that the Company had provided its revenue guidance with "full confidence, quantification and detail in this season of great uncertainty." (*Id.* ¶ 81). However, Zubretsky and Keim both acknowledged that the Company was projecting higher MCR figures for the second half of the year, which the Company expected to negatively impact its profitability. *See* (*id.* ¶¶ 77–85). Zubretsky

told investors that the Company considered its $19 adjusted earnings per share guidance to be "a floor" and said that the Company believed "the cost trend" driving the Company's reduced earnings per share guidance "could moderate" and "produce earnings upside." (*Id.* ¶ 77). Zubretsky also said the Company was able to "effectively manage" the impact of "elevated utilization" in its Medicare segment through "cost control protocols." (*Id.* ¶ 79).

7. <u>3Q25 Financial Results</u>

On October 22, 2025, the Company announced its financial results for the third quarter of 2025. *See* (*id.* ¶ 86). In its earnings press release for the quarter, the Company re-affirmed its revenue guidance for the year but further reduced its earnings per share guidance to $11.90 per share using GAAP earnings or $14 per share using adjusted earnings. *See* (*id.* ¶ 87). The press release quoted Zubretsky as saying that "approximately half" of the Company's underperformance was "driven by the Marketplace business." (*Id.* ¶ 86). Zubretsky also said that the Company's Medicaid segment was "experiencing some pressure" but still "producing strong margins." (*Id.*).

During the Company's quarterly earnings call, on October 23, 2025, Zubretsky addressed the Company's revised earnings per share guidance. *See* (*id.* ¶ 88). Zubretsky explained that approximately "half" of the Company's reduction to guidance was attributable to an "unprecedented utilization trend" in the Company's Marketplace segment. *See* (*id.*). Zubretsky also said that the Company was seeing a "challenging trend environment" and expected the "medical cost trend" in its Medicaid segment to increase to "100 basis points higher than previous guidance." (*Id.*).

**C. Plaintiff's Theory of Fraud**

Plaintiff alleges that, in nearly every statement listed above, Defendants intentionally or recklessly concealed from investors that Defendants "did not have the ability to accurately manage Molina's medical care costs" and "did not have sufficient visibility into members' medical expenses or demand for medical services to manage medical utilization rates." (*Id.* ¶ 90). Plaintiff alleges that the false or misleading nature of the Challenged Statements "is demonstrated by the fact that [the Company] had to materially revise down

its FY25 guidance multiple times (and by wide margins)" throughout fiscal year 2025. *See* (*id.* ¶ 91). Plaintiff also alleges that the false or misleading nature of the Challenged Statements is evidenced by the fact that the Company's reported results for the fourth quarter of 2024 and second quarter through fourth quarter of 2025 were "vastly below analyst expectations." (*Id.* ¶ 92).

**D. Investor Losses**

Plaintiff alleges that Defendants' "materially false and/or misleading statements artificially inflated the price of Molina's stock." *See* (*id.* ¶ 118). Plaintiff claims that the Company's "inability to accurately assess medical costs and utilization rates was revealed to the market in a series of consecutive guidance reductions and earnings misses throughout the second half of 2025 and into the first quarter of 2026." (*Id.* ¶ 94). Specifically, Plaintiff alleges that Defendants made corrective disclosures in statements announcing the Company's second quarter, third quarter, and year-end 2025 financial results. *See* (*id.* ¶¶ 122–23, 130, 133). Plaintiff alleges that, through each of these disclosures, it became "apparent" to the market that Defendants had "failed to disclose and misrepresented . . . adverse facts relating [to] the Company's ability to predict and manage medical utilization and costs." (*Id.* ¶ 118, 122).

First, on July 23, 2025, the Company reported its earnings results for the second quarter of 2025 and reduced its 2025 earnings per share guidance by $5.50. *See* (*id.* ¶¶ 55, 71). In its earnings press release for the quarter, the Company wrote that it had "experienced medical cost pressure due to continued utilization of behavioral health, pharmacy, and inpatient and outpatient services." (*Id.* ¶¶ 72, 123). The Company also said that its updated guidance reflected "new information gained in the quarterly closing process and implications for medical cost trend assumptions for the second half of the year." (*Id.* ¶¶ 73, 123). Following the Company's announcement, the Company's stock price fell by almost 17%. *See* (*id.* ¶ 127).

Then, on October 22, 2025, the Company reported its earnings results for the third quarter of 2025 and further reduced its 2025 earnings per share guidance by approximately

$5 per share. *See* (*id.* ¶ 130). In the Company's earnings press release for the quarter, the Company said that its updated guidance reflected a "higher medical cost trend in all segments," including an "unprecedented medical cost trend" in the Company's Marketplace segment. *See* (*id.*). Following the Company's announcement, the Company's stock price fell by approximately 19%. *See* (*id.* ¶ 131).

Finally, on February 5, 2026, the Company reported its earnings results for the fourth quarter of 2025 and 2025 as a whole. *See* (*id.* ¶ 133). In its earnings release, the Company reported a $160 million loss in the fourth quarter of 2024, announced that it had earned $472 million in profit for the year, and projected 2026 guidance of $5 per share. *See* (*id.*). Following the Company's announcement, the Company's stock price fell by approximately 30%. *See* (*id.* ¶ 136).

## II. PROCEDURAL BACKGROUND

Plaintiff Jeffrey Hindlemann filed this action in October 2025. *See* (ECF No. 1). Pursuant to the Private Securities Litigation Reform Act ("PSLRA"), two investors filed motions seeking appointment as lead plaintiff for the purported class. *See* (ECF Nos. 13, 27). On January 30, 2026, the Court appointed the Automotive Industries Pension Trust Fund as lead plaintiff. *See* (ECF No. 42). On March 31, 2026, Plaintiff filed the operative Complaint. The Complaint asserts two causes of action: (1) a claim for violations of § 10(b) of the Exchange Act and SEC Rule 10b-5, promulgated thereunder; and (2) a claim for violations of § 20(a) of the Exchange Act. *See* (Compl. ¶¶ 147–61).

On June 5, 2026, Defendants filed the instant Motion, as well as a Request for Judicial Notice. *See* (ECF No. 56 ("RJN"). On July 16, 2026, Plaintiff filed briefs in opposition to the Motion, *see* (ECF No. 58 ("Opp.")), and Defendants' Request for Judicial Notice, *see* (ECF No. 59 ("RJN Opp.")). On August 21, 2026, Defendants filed reply briefs in support of the Motion, *see* (ECF No. 60 ("Reply")), and the Request for Judicial Notice, *see* (ECF No. 61 ("RJN Reply")).

## III. LEGAL STANDARD

To state a claim for securities fraud, plaintiffs must satisfy three requirements. *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 690–91 (9th Cir. 2011). First, consistent with Rule 8(a)(2), a plaintiff must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), alleging "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In ruling on such a motion, the court must "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). However, the court is "not required to accept as true allegations that contradict exhibits attached to the Complaint," allegations that contradict "matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Seven Arts Filmed Ent., Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013) (internal quotation marks omitted).

Second, a plaintiff must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b), requiring that fraud claims "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To meet this standard, a plaintiff must identify "the time, place, and content of [the] alleged misrepresentation[s]," as well as the "circumstances indicating falseness" or "the manner in which the representations at issue were false and misleading." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547–48 (9th Cir. 1994) (internal quotation marks and alterations omitted); *see also Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) ("Rule 9(b) requires a party to state with particularity the circumstances constituting fraud or mistake, including the who, what, when, where, and how of the misconduct charged." (internal quotation marks omitted)). Those allegations "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against

the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). Although the circumstances of the alleged fraud must be alleged with specificity, knowledge "may be alleged generally." Fed. R. Civ. P. 9(b).

Finally, a plaintiff must satisfy the additional requirements of the PSLRA, which "require that a complaint plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (internal quotation marks omitted). Under the PSLRA, a complaint must (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)–(2).

## IV. REQUEST FOR JUDICIAL NOTICE

Generally, at the motion to dismiss stage, courts may not consider any material beyond the pleadings when assessing the sufficiency of a complaint under Federal Rule of Civil Procedure 12(b)(6). *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) ("[R]eview is limited to the complaint."). If a court considers such extrinsic evidence, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). However, under the doctrines of incorporation-by-reference and judicial notice, courts may consider the contents of certain extrinsic documents "without converting the motion to dismiss into a motion for summary judgment." *Lee*, 250 F.3d at 688. Defendants request that the Court incorporate by reference or take judicial notice of 27 exhibits. *See* (RJN at 2–4).[1]

### A. Incorporation by Reference

Pursuant to the "judicially created" incorporation-by-reference doctrine, courts may consider an external document to be "part of the complaint itself" if "the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim."

[1] All exhibits referenced herein are exhibits to the Declaration of Morgan E. Schneer. *See* (ECF No. 55-4, Declaration of Morgan E. Schneer).

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). The doctrine seeks to prevent "plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* A court may also "assume an incorporated document's contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Id.* at 1003 (alterations omitted). However, "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.*

Defendants argue that 17 exhibits are incorporated by reference into the Complaint. *See* (RJN at 7–8). Fourteen exhibits are the SEC filings, press releases, earnings call transcripts, and Investor Day transcript in which Defendants made the Challenged Statements. *See* (Exs. 3, 5–7, 9, 12–20); *see also* (Compl. ¶¶ 41–42, 44–45, 47–53, 54–69, 71, 73–88).[2] One exhibit is an earnings call transcript in which Plaintiff alleges Defendants made a corrective disclosure. *See* (Ex. 22); *see also* (Compl. ¶ 133). Two exhibits are analyst reports that Plaintiff quotes in the Complaint to establish loss causation. *See* (Exs. 21, 23); *see also* (Compl. ¶¶ 132, 136). Plaintiff does not object to these exhibits, *see* (RJN Opp. at 6–7), and the Court considers Exhibits 3, 5 through 7, 9, and 12 through 23 incorporated by reference into the Complaint, *see Alghazwi v. Beauty Health Co.*, 801 F. Supp. 3d 982, 999 (C.D. Cal. 2025) (documents in a securities fraud case that contain the statements alleged to be false or misleading are incorporated by reference into the complaint); *see also Garcia v. J2 Glob., Inc.*, No. 2:20-CV-06096-FLA (MAAX), 2021 WL 1558331, at *5 (C.D. Cal. Mar. 5, 2021) (considering documents that contained the alleged misrepresentations and corrective disclosures identified in the complaint to be incorporated by reference).

**B. Request for Judicial Notice**

Judicial notice under Federal Rule of Evidence 201 authorizes courts to notice an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact

---

[2] Plaintiff also alleges that Defendants made corrective disclosures in Exhibits 16 and 19. *See* (Compl. ¶¶ 123, 130).

is "not subject to reasonable dispute" if it is "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1), (2). Accordingly, "[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." *Lee*, 250 F.3d at 689 (internal quotation marks and citation omitted). However, "accuracy is only part of the inquiry under Rule 201(b)." *Khoja*, 899 F.3d at 989. A court must also "consider—and identify—which fact or facts it is noticing" from a document. *Id.* "Just because [a] document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Id.*

Defendants request that the Court take judicial notice of 9 exhibits. *See* (Exs. 1–2, 4, 8, 10–11, 24–27). These exhibits contain nearly 300 pages, and the Request for Judicial Notice does not address what specific fact in each exhibit is subject to judicial notice and the purpose for which the Court should take judicial notice of these facts. *See* (RJN at 8–10). From the Court's review of the Motion, it appears Defendants primarily cite these exhibits to provide background information about the Company's operations and to create factual disputes not appropriate for resolution on a motion to dismiss. *See, e.g.*, (Motion at 13–19). As a result, the Court declines to take judicial notice of Exhibits 1 through 2, 4, 8, 10 through 11, and 24 through 27. *See, e.g.*, *Fluor Corp. v. Resolute Mgmt., Inc.*, No. 821CV01907JLSKES, 2022 WL 2101891, at *2 (C.D. Cal. May 4, 2022) (declining to take judicial notice of SEC filings because the defendant did not specify what facts it sought to notice in the filings); *see also In re Snap Inc. Sec. Litig.*, No. 217CV03679SVWAGR, 2018 WL 2972528, at *4 n.12 (C.D. Cal. June 7, 2018) (declining to take judicial notice of documents submitted to create factual disputes on a motion to dismiss).

## V. DISCUSSION

To state a claim for a violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), a plaintiff must allege "(1) a material misrepresentation or omission ('falsity'), (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation." *In re*

*Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024). Section 20(a) of the Exchange Act extends liability to those who wield control over the primary violator. *See* 15 U.S.C. § 78t(a). To establish a cause of action under Section 20(a), a plaintiff must first prove a primary violation of Section 10(b) and then show that the defendant exercised actual power over the primary violator. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014). In the Motion, Defendants argue that Plaintiff's Section 10(b) and 20(a) claims fail, because the Complaint does not plead facts to show falsity, scienter, or loss causation. *See* (Motion at 21–35). For the reasons discussed below, the Court agrees that Plaintiff has failed to plausibly allege facts to establish falsity or scienter.

**A. Falsity**

In the Complaint, Plaintiff challenges 45 statements as false or materially misleading. *See* (Compl. ¶¶ 41–45, 47–69, 71–88). It challenges 30 statements concerning the Company's forward-looking financial guidance, *see* (*id.* ¶¶ 41–43, 55–58, 60–62, 65–69, 71–74, 76–78, 80–85, 87–88); 10 statements concerning the Company's operational capacities and business model, *see* (*id.* ¶¶ 44, 47–48, 50–54, 63–64); and 5 statements concerning the Company's historical performance, *see* (*id.* ¶¶ 49, 59, 69, 75, 86). Plaintiff alleges that every one of these statements was false or materially misleading because Defendants "concealed" that Defendants did not have the ability to accurately manage the Company's costs, forecast members' medical expenses, or forecast members' demand for medical services. *See* (*id.* ¶ 90). Plaintiff alleges that the Company's inability to manage costs, forecast expenses, and forecast demand "is demonstrated by the fact that it had to materially revise" its 2025 guidance on several occasions. *See* (*id.* ¶ 91).

1. Forward-Looking Statements

Defendants argue that 34 statements are inactionable under the PSLRA's safe harbor as forward-looking statements. *See* (ECF No. 55-2, Motion, App. A); *see also* (Compl. ¶¶ 41–43, 51–52, 54–58, 60–69, 71, 73–74, 76–78, 80–85, 86, 88).[3] The vast majority of

---

[3] Defendants filed two appendices in support of their brief. One appendix groups each Challenged Statement according to Defendants' arguments for why the Challenged

these statements address the Company's earnings guidance. *See, e.g.*, (Compl. ¶ 41 ("The Company reaffirmed its full year 2024 guidance with expected premium revenue of approximately $38 billion and adjusted earnings of at least $23.50 per diluted share.")). However, a handful of statements address the Company's operational capacity and business model. *See, e.g.*, (*id.* ¶ 51 ("We've built a great platform, and we can sustain the trajectory we have been on for the past three years for the next three."); *id.* ¶ 54 ("We remain confident in our ability to achieve our long-term financial targets")).

Under the PSLRA's safe harbor provision, forward-looking statements are subject to special protections. *See* 15 U.S.C. § 78u-5(c)(1). A "forward-looking statement" is any statement concerning "(1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003). Statements about a company's earnings guidance are, by definition, forward-looking. *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). The safe harbor applies if a forward-looking statement is "(1) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or (2) "if it is not identified as a forward-looking statement and not accompanied by cautionary language, unless the statement was 'made with actual knowledge . . . that the statement was false or misleading.'" *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) (quoting 15 U.S.C. § 78u-5(c)(1)). Thus, a defendant cannot be held liable

---

Statements are inactionable, such as because a Challenged Statement is a forward-looking statement, an inactionable opinion, or inactionable puffery. *See* (*id.*). The other appendix compiles Defendants' risk disclosures for each quarter. *See* (ECF No. 55-3, Motion, App. B). Plaintiff argues that the Court should refuse to consider the appendices to Defendants' Motion, as an "end-run around the [applicable] page limitations." (Opp. at 15). The Court declines to do so. The Complaint challenges 45 statements as false or materially misleading, and Plaintiff has not supplied an alternative framework by which to group the Challenged Statements.

for a false or misleading statement if "it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017).

The Court agrees that the 34 statements identified in Defendants' Motion are forward-looking statements. Most of these statements are "classic growth and revenue projections, which are forward-looking on their face." *Intuitive Surgical*, 759 F.3d at 1058; *see, e.g.*, (Compl. ¶ 58 ("The Company expects its full year GAAP earnings in 2025 to be at least $22.32 per share and reaffirms its full year adjusted earnings in 2025 to be at least $24.50 per share, representing 8% growth over the full year 2024.")). Similarly, the Company's statements concerning its projected MCRs address the assumptions underlying or related to the Company's financial projections and future economic performance. *See Am. W. Holding Corp.*, 320 F.3d at 936. To the extent that Plaintiff argues that seven of these statements also contain representations about current or past facts, *see* (Opp. at 18 (citing Compl. ¶¶ 51–52, 54, 63–65, 81)), these representations are either inactionable puffery or Plaintiff has failed to allege why they are false.[4]

During the Class Period, the Company's SEC filings specifically warned investors that the Company's guidance, projections, and expectations for future performance are forward-looking statements, which depend on the Company's ability to effectively manage medical costs and predict utilization rates with a reasonable degree of accuracy. *See, e.g.*,

---

[4] Plaintiff also argues that some statements concerning the Company's guidance are "mixed" statements, rather than forward-looking statements, because Defendants prefaced their statements with the phrases "[w]e are seeing" and "[w]e continue to see." *See* (Opp. at 19). However, Plaintiff does not allege that the non-forward-looking statements referenced in the cited paragraphs are false or misleading. For example, in paragraph 66 of the Complaint, Plaintiff presents a four-paragraph block quote, which includes the statement "[w]e are seeing rate increases slightly higher than we had previously expected as our state partners continue to update their actuarial data." (Compl. ¶ 66). However, Plaintiff only challenges other, unrelated statements in this paragraph as false or misleading. *See, e.g.*, (*id.* (challenging the statement, "[w]ithin Medicaid, the full year MCR is unchanged at 89.9%")).

(Ex. 13, 1Q25 Form 10-Q, at 21). Similarly, during the Company's earnings calls, Defendants told investors that the Company would be making forward-looking statements, warned investors that these statements were "subject to certain risks and uncertainties" that could cause the Company's results to differ from its projections, and referred investors to the risk factors in its most recent quarterly and annual SEC filings. *See, e.g.*, (Ex. 14, 1Q25 Earnings Transcript, at 5); *see also Intuitive Surgical*, 759 F.3d at 1059 (forward-looking statements on an earnings call were inactionable, on a motion to dismiss, where the company warned about "certain risks and uncertainties" and referred investors to the company's SEC filings). Because Defendants warned investors about the specific risks that purportedly rendered Defendants' forward-looking statements false or misleading, *see* (Compl. ¶ 90), Defendants are protected from liability under the PSLRA's safe-harbor provision for their forward-looking statements.

2. <u>Inactionable Puffery</u>

Defendants argue that 15 of the Challenged Statements are inactionable puffery. *See* (ECF No. 55-2, Motion, App. A); *see also* (Compl. ¶¶ 44–45, 47–48, 50–54, 63–65, 75, 79, 81). "Statements of mere corporate puffery . . . are not actionable because professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Intuitive Surgical*, 759 F.3d at 1060 (internal quotation marks omitted). "When valuing corporations, . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *Cutera*, 610 F.3d at 1111; *see also City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1063 (N.D. Cal. 2012) ("[V]ague, generalized assertions of corporate optimism . . . are not actionable material misrepresentations under federal securities laws because no reasonable investor would rely on such statements." (internal quotation marks omitted)).

The Court agrees that almost all of the statements identified in Defendants' Motion are inactionable puffery. For example, Plaintiff challenges statements in which Defendants characterized the Company's "medical economics platform" as "state-of-the-art," (Compl. ¶ 47), and its margins as "best in class," (*id.* ¶ 48); statements in which Defendants said the

Company could "sustain" its trajectory and its model was "working exactly as . . . predicted," (*id.* ¶¶ 45, 51); statements in Defendants said the Company had a "clear formula" to deliver "sustainable MCR," (*id.* ¶ 50); statements in which Defendants referred to the Company's "plan" as "empirical," "data driven," and "fact-based," (*id.* ¶ 52); statements in which Defendants said the Company's 2025 guidance created a "strong foundation" for the Company to grow, (*id.* ¶ 63); and statements in which Defendants generally touted their confidence to investors, (*id.* ¶¶ 54, 64–65, 81). These statements are inactionable. *See, e.g.*, *Thant v. Rain Oncology Inc.*, No. 5:23-CV-03518-EJD, 2025 WL 588994, at *8 (N.D. Cal. Feb. 24, 2025) (statements referring to a product as "best-in-class"); *In re Cisco Sys. Inc. Sec. Litig.*, No. C 11-1568 SBA, 2013 WL 1402788, at *13 (N.D. Cal. Mar. 29, 2013) (statements that company had a "strong foundation" and was "extremely well positioned"); *Juniper Networks*, 880 F. Supp. 2d at 1064 (statements referring to "good momentum," "strong demand metrics," and "confidence" in growth).

However, the Court disagrees that statements concerning the Company's ability to "effectively manage" utilization and costs constitute puffery. *See, e.g.*, (Compl. ¶ 75 (statement saying that the Company's consolidated MCR of 90.4% "reflect[ed] a very challenging medical cost trend environment for each of our segments," "moderated by our effective medical cost management"); *id.* ¶ 79 ("In Medicare, our full year guidance includes an MCR of 90% and a low single-digit pre-tax margin. We continue to effectively manage the elevated utilization through our cost control protocols.")). "Corporate puffing involves expressing an opinion that is not capable of objective verification." *Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1097 (9th Cir. 2022) (internal quotation marks omitted). Here, whether the Company was able to mitigate the broader medical cost trend affecting insurers through cost controls and effective cost management is capable of objective verification. Accordingly, the Company's statements about its ability to manage utilization and costs are not so general and abstract that they are "extremely unlikely to induce consumer reliance." *See Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008) ("Ultimately, the difference between a

statement of fact and mere puffery rests in the specificity or generality of the claim."). Nevertheless, as discussed below, Plaintiff has not alleged facts to show that these statements were false.

3. <u>Failure to Plead Falsity</u>

Plaintiff only challenges a handful of statements as false or materially misleading that are not protected by the PSLRA's safe harbor provision or inactionable as puffery. *See, e.g.*, (Compl. ¶¶ 49, 69, 75, 79, 86). In addition to the statements about the Company's ability to manage costs, identified above, Plaintiff challenges a statement in the Company's November 2024 Investor Day presentation saying, "Medicaid risk corridor positions are a result of margin outperformance and help mitigate potential inflections in medical cost trends." (*Id.* ¶ 49). It challenges a statement in the Company's preliminary second quarter 2025 press release, saying that "[t]he Company's announcement of preliminary results was driven by recent market dynamics and off-cycle disclosures from others in the managed health care sector." (*Id.* ¶ 69). It also challenges a statement in the Company's third quarter 2025 earnings press release, saying "[t]he headline for the quarter is that approximately half of our underperformance is driven by the Marketplace business, and that Medicaid, while experiencing some pressure, is producing strong margins." (*Id.* ¶ 86).

To state a claim for securities fraud, the Complaint must specify each statement alleged to be false or misleading, what is false or misleading about each statement, and why each statement is false. *See In re Cloudera, Inc.*, 121 F.4th 1180, 1187 (9th Cir. 2024). For a statement to be false or misleading, it must directly contradict what the defendant knew at the time or omit material information. *See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023). Thus, a complaint may not plead fraud by hindsight. Instead, plaintiffs must explain "why the statements were false or misleading at the time they were made." *Cloudera*, 121 F.4th at 1187. "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false," does not meet the PSLRA's "exacting" requirements for pleading

falsity. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

Furthermore, where a plaintiff seeks to show falsity under an omission theory, "[d]isclosure is required only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Khoja*, 899 F.3d at 1009 (internal quotation marks and ellipses omitted). Thus, to show a statement was false because it omitted material information, a plaintiff must allege facts to show that the omission would give "a reasonable investor an impression of a state of affairs that differs in a material way from the one that actually exists." *Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1131 (9th Cir. 2025) (internal quotation marks omitted).

Plaintiff alleges that all the Challenged Statements are false or materially misleading because Defendants "concealed" that they did not have the ability to accurately manage the Company's medical costs, forecast medical expenses, and forecast demand for medical services. *See* (Compl. ¶ 90). However, Plaintiff has not explained why the Company's statements addressing its risk corridor positions, the reason why the Company announced its preliminary second quarter 2025 results ahead of schedule, and the reason why the Company underperformed in the third quarter of 2025 would give investors an impression of a state of affairs that differs in a material way from reality. Thus, because Plaintiff has not explained why these statements "were false or misleading at the time they were made," *Cloudera*, 121 F.4th at 1187, the Complaint falls short of the PSLRA's "exacting" requirements, *see Metzler*, 540 F.3d at 1070.

More fundamentally, Plaintiff has not plausibly alleged facts to show Defendants did not have the ability to accurately manage costs, forecast expenses, and forecast demand at the time Defendants made each of the Challenged Statements. Plaintiff's theory of falsity is premised solely on "the fact that [the Company] had to materially revise down its FY25 guidance multiple times (and by wide margins) before announcing its actual FY25 EPS number in February 2026 (as well as its projected FY26 EPS number)." *See* (Comp. ¶ 91). Plaintiff does not allege facts to show, at the time Defendants made the Challenged

Statements, Defendants had access to information that cast doubt on their ability to manage costs and forecast expenses. Therefore, the Complaint does not plausibly allege that the Challenged Statements were false at the time they were made. *See In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996) ("[T]he fact that [a] prediction proves to be wrong in hindsight does not render [a] statement untrue when made.").

**B. Scienter**

The Complaint independently fails to state a claim because it does not show any Defendant acted with scienter. To establish scienter under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To meet this standard, "a complaint must allege that the defendant made false or misleading statements with an intent to deceive, manipulate, or defraud, or with deliberate recklessness." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1106 (9th Cir. 2021) (internal quotation marks omitted). Deliberate recklessness is "an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Id.* As a corporation, the Company "can only act through its employees and agents and can likewise only have scienter through them." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 701 (9th Cir. 2021) (internal quotation marks omitted).

To determine whether a plaintiff has pled scienter, courts must determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23. To do so, courts within the Ninth Circuit conduct a two-part inquiry. *See Zucco*, 552 F.3d at 992. First, the court must "determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter." *Id.* Then, "if no individual allegations are sufficient," the court must "conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.* In

making this inquiry, "courts must 'take into account plausible opposing inferences' and determine that 'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Alphabet*, 1 F.4th at 701 (quoting *Tellabs*, 551 U.S. at 323–24).

To show scienter, Plaintiff relies on (1) the "core operations" doctrine; (2) Zubretsky's sale of stock during the Class Period; and (3) Zubretsky and Keim's certifications under the Sarbanes-Oxley ("SOX") Act. *See* (Compl. ¶¶ 108–16); *see also* (Opp. at 24–31). For the reasons discussed below, the facts alleged do not support a strong inference that Defendants either intentionally or recklessly misled investors to believe that the Company was accurately able to manage costs, forecast expenses, and forecast demand.

1. The "Core Operations" Doctrine

First, Plaintiff argues that the Court can infer Defendants acted with scienter under the "core operations" doctrine. *See* (Opp. at 25–29). Under the "core operations" doctrine, courts may infer that "facts critical to a business's 'core operations'. . . are known to a company's key officers." *Webb v. Solarcity Corp.*, 884 F.3d 844, 854 (9th Cir. 2018). In most cases, to show scienter based solely on management's role within a company, a plaintiff must allege "particular" facts to suggest that defendants had "actual access to the disputed information." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008). However, in "rare circumstances," a plaintiff can establish scienter based on management's role within the company where "the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Id.* The facts alleged are insufficient to establish scienter under either basis.

To establish falsity, Plaintiff alleges that the Company was not able to accurately manage costs from medical care, forecast medical expenses, or forecast demand for medical services. *See* (Compl. ¶ 90). Plaintiff does not allege any facts available to individuals inside the Company to show, at the time Defendants made the Challenged Statements, that the Company's executives were aware of problems with the Company's ability to manage costs, forecast expenses, or forecast demand. Thus, Plaintiff has not

alleged "particular" facts to show that Defendants were aware of information showing that the Challenged Statements were false or misleading when made. *See Killinger*, 542 F.3d at 786. Instead, Plaintiff relies on a series of general statements from Zubretsky and Keim concerning their "hands-on" management style to argue that Defendants acted with scienter by misleading investors about the Company's ability to manage costs, forecast expenses, and forecast demand. *See* (Opp. at 27–28); *see, e.g.*, (Compl. ¶ 11 (Keim: "[W]hat I always say about Molina is we're big enough to be relevant in all the big company ways, yet we're small enough that we really run it in a very hands-on way.")). These statements are insufficient to infer that Zubretsky and Keim had access to information that showed the Company had trouble managing costs and its models were inaccurate. *See Prodanova*, 993 F.3d at 1109 ("[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud.").

Additionally, this is not one of the rare cases in which the alleged fraud relates to facts that are so essential to the Company's business that it would be absurd for Zubretsky and Keim not to have known that the Challenged Statements were false or materially misleading. To show scienter under this form of the core operations doctrine, plaintiffs must allege facts showing that defendants "must have known" that they were providing false information to investors because "the falsity of the information was obvious from the operations of the company." *Zucco*, 552 F.3d at 1001. Plaintiff has not alleged facts to show that there were problems with the Company's models for healthcare costs and demand that should have been "patently obvious" to executives. *See id.*

2. <u>Insider Stock Sales</u>

Next, Plaintiff argues the Court can infer Defendants acted with scienter based on Zubretsky's sale of stock during the Class Period. *See* (Opp. at 29–30). Plaintiffs can show scienter through "unusual" or "suspicious" stock sales. *See Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001), *abrogated on other grounds by Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 37–49 (2011). However, "[i]nsider stock sales are not inherently suspicious."

*In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002), *abrogated on other grounds by Matrixx*, 563 U.S. at 37–49. Instead, "such sales only give rise to an inference of scienter when they are dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Metzler*, 540 F.3d at 1067 (internal quotation marks omitted). Courts consider three factors to determine whether insider stock sales support a finding of scienter: (1) "the amount and percentage of the shares sold"; (2) "the timing of the sales"; and (3) "whether the sales were consistent with the insider's trading history." *Id.*

Here, the timing of Zubretsky's sales lends some support to Plaintiff's theory. Zubretsky sold stock shortly after the Company announced its first quarter 2025 financial results, on April 23, 2025. *See* (Compl. ¶ 57). In that announcement, the Company reaffirmed its full year guidance of "adjusted earnings of at least $24.50 per diluted share." *See* (*id.*). A week later, on April 30, 2025, Zubretsky sold 87,500 shares. *See* (*id.* ¶ 112). Approximately two months later, on July 7, 2025, the Company issued preliminary financial results for the second quarter of 2025. *See* (*id.* ¶ 69). In its announcement, the Company lowered its earnings per share guidance from $24.50 per share to a "range" from $22.50 per share to $21.50 per share. *See* (*id.* ¶ 69). The Company proceeded to lower its adjusted earnings per share guidance to $19 per share in its final second quarter 2025 results, *see* (*id.* ¶ 71), and $11.90 per share in its third quarter 2025 results, *see* (*id.* ¶ 87).

However, Zubretsky only sold approximately 23% of his holdings, and Plaintiff has not alleged that any other executives sold stock during the Class Period. Courts within the Ninth Circuit "typically require larger sales amounts—and corroborative sales by other defendants—to allow insider trading to support scienter." *Metzler*, 540 F.3d at 1067 (CEO's sale of approximately 37% of holdings during the class period was not suspicious); *see also Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001) ("One insider's well timed sales do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made."

(internal citation omitted)). Plaintiff also has not alleged facts to show that Zubretsky's sale was "dramatically" out of line with his prior trading history. *Metzler*, 540 F.3d at 1067. According to the Complaint, Zubretsky sold stock in 2022. *See* (Compl. ¶ 112). However, Plaintiff does not allege how many shares Zubretsky sold, how his sale compared to his total holdings at the time, or the price at which Zubretsky sold stock.

3. <u>SOX Certifications</u>

Finally, Plaintiff argues that Zubretsky's SOX certifications support an inference of scienter. "[P]ursuant to section 302(a) of the Sarbanes-Oxley Act, a company's 'principal executive officer or officers and the principal financial officer or officers' must certify the accuracy and reliability of its quarterly financial reports." *Zucco*, 552 F.3d at 1003 (quoting 15 U.S.C. § 7241(a)). However, "Sarbanes-Oxley certifications are not enough to create a strong inference of scienter and do not make . . . otherwise insufficient allegations more compelling by their presence in the same complaint." *Id.* at 1004. Zubretsky's "boilerplate" Sarbanes-Oxley certifications "add nothing substantial to the scienter calculus." *Id.* at 1004.

4. <u>Holistic Analysis</u>

If no individual allegation is sufficient to create a strong inference of scienter, courts must undertake a "holistic" analysis of the same allegations to determine whether "the insufficient allegations combine to create a strong inference of intentional conduct or deliberate reckless." *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323. "Even if a set of allegations may create an inference of scienter greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation." *Zucco*, 552 F.3d at 1006. Here, based on the facts alleged, Plaintiff has not shown that Zubretsky and Keim were aware of information that suggested the Company was facing problems managing and forecasting costs, such that there was a serious risk that the Company's guidance was unduly optimistic. Instead, it is equally

plausible that, to the extent there were problems with the Company's models, Zubretsky and Keim were not aware of these problems and genuinely believed that the Company's projections were accurate. Therefore, Plaintiff has not plausibly alleged scienter.

Because Plaintiff has failed to allege facts to establish falsity or scienter, the Court GRANTS the Motion as to Plaintiff's claims under Section 10(b) and Section 20(a).

### C. Leave to Amend

Plaintiff has requested leave to amend. Generally, "in dismissals for failure to state a claim, a district court should grant leave to amend." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). Nevertheless, a district court may, in its discretion, deny leave to amend when amendment would be futile. *Zucco*, 552 F.3d at 1007. Amendment is considered futile where "allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010). The Court does not find at this time that amendment would be futile and will grant Plaintiff one additional opportunity to amend to cure the deficiencies identified in this order only.

## VI. CONCLUSION

For the foregoing reasons, the Court GRANTS the Motion. Within 21 days of the issuance of this order, Plaintiff may file a First Amended Complaint ("FAC") curing the deficiencies identified herein. If Plaintiff fails to file an FAC within 21 days, the case shall be closed.

**IT IS SO ORDERED.**

DATED: September 14, 2026

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE